JOSEPH MECH v. TERMINAL RAILROAD ASSOCIATION OF ST. LOUIS, Appellant.—18 S. W. (2d) 510.

Division One, May 18, 1929.

*J. L. Howell* and *R. E. Blodgett* for appellant.

*Charles P. Noell* and *Hensley, Allen & Marsalek* for respondent.

LINDSAY, C.—This is an action for damages for personal injuries, suffered by the plaintiff while in the employ of defendant.

The suit was brought under the Federal Employers' Liability Act. At the time of his injury the plaintiff was foreman of a switch crew of defendant, and engaged in moving seven passenger coaches propelled by an engine, from the yards of defendant at Atlantic Street in the city of St. Louis, to their respective appropriate places on tracks in Union Station, in said city. Certain of the cars being so moved were the property of the Illinois Central Railroad Company, and the remainder were the property of the Chicago & Eastern Illinois Railroad Company. The purpose was to set the coaches of the Chicago & Eastern Illinois Company on track 25, and the others on track 28, in Union Station. These cars when so assembled there, would become parts of regular trains of the respective railroad companies running out of Union Station to their destinations, which were respectively Chicago, Illinois, and Springfield, Illinois. From the Atlantic Street yards the train of seven cars was being pushed eastward. The plaintiff, as foreman, stood on the platform of the car at the east, or advancing end of the train. He had in his hand the "tail hose," an appliance connected with the air line and air brakes of the cars composing the train, which could be used to operate the brakes and control the speed of the train, or stop it. These cars at the time in question were moving on the track designated as track No. 52, toward Union Station. Within Union Station there were thirty-two tracks on which passenger trains were assembled for outgoing movements. Over track 52 defendant maintained a system of block signals. These signals were located on bridges over the tracks, referred to as signal bridges. They were operated and controlled by an employee of defendant from a tower located near the track. The various signals for service in the nighttime, were given by showing a yellow, green or red light, over the signal bridge. A green light was used to indicate a clear track. The rules of defendant defining the meaning and use of these signals were introduced in evidence, and will be noticed hereafter. The signal bridges from which these lights were shown, were numbered. Over track 52 were located signal bridges numbered 17 and 9. The distance between them constituted a block for signalling purposes. A train moving on track 52 toward Union Station, as was the train on which the plaintiff was located, would pass under signal bridge 17, moving toward signal bridge 9. Passing signal bridge 17 toward the Union Station track 52 curves somewhat northward. On the occasion in question the signal over bridge 17 showed a green light, but at a short distance beyond the curve in the track, track 52 on which this train was moving, there had passed and then stood at the time on that track, an engine and train of cars. The train on which plaintiff was working collided with the engine attached to the other train, and as a result plaintiff received the injuries for which he sued.

The engine with which plaintiff's train collided is referred to in the petition and evidence as engine 96.

The amended petition on which the case was tried, alleged that defendant was engaged in interstate commerce and plaintiff was injured while employed as switchman by defendants in such commerce, and that his injuries resulted in whole, or in part, from the negligence of defendant's employees and agents. The petition set forth the manner of doing the work in which the plaintiff was engaged and the maintenance, manner of use, and meaning of the signals, furnished by defendant in operating trains at that place, under the rules of defendant. The petition next set forth the respective acts of plaintiff and defendant at the time, which was at about two o'clock A. M., May 17, 1924.

Negligence is specified under two heads. The first, was the failure of the defendant's tower man to change the signal light on signal bridge No. 17 from green to red, when engine No. 9 and its train moved into and stopped in the block between signal bridges No. 17 and No. 9, whereby, plaintiff seeing the signal on signal bridge No 17 was green, proceeded into the block between bridges No. 17 and No. 9, and his train collided with engine No. 96. Negligence under the second head is specified as follows:

"Defendant's tower man knew, or by the exercise of ordinary care could have known, that there was an engine and train of defendant's standing on track 52 and that the train plaintiff was on was proceeding toward said stationary engine and train on track 52, and under the method of doing the work and under the rules of defendant, and under a long-established custom and practice known to both defendant and plaintiff and relied upon by plaintiff at the time and place in question, it was the duty of defendant's tower man to operate a lever and cause the signal on bridge No. 17 to indicate with a red light that track 52 was blocked with said engine and train between signal bridge No. 17 and signal bridge No. 9, yet defendant's tower man negligently failed and omitted throwing a certain lever in said tower which would have caused the signal to change from green to red and negligently violated the aforesaid rules, custom and practice, and as a direct result of the negligence of defendant's tower man in permitting a green signal on signal bridge No. 17 to be indicated and failing to throw a red signal on bridge No. 17, plaintiff on a train being pushed on track 52 proceeded past signal bridge No. 17 and collided with a train standing around a curve on said track between signal bridges No. 17 and No. 9."

The petition then set forth the injuries suffered by the plaintiff, but these need not be described here, because no issue is made on appeal in reference to the character of the injuries, or the amount of the judgment rendered.

The answer was a general denial, and averment that whatever injuries the plaintiff received were caused by his own act, in the manner in which he performed his own work, in that he had charge and control of the speed and stopping of the train and cars in question, and nevertheless caused the same to collide with another train, followed by allegation that whatever injuries the plaintiff received were the result of risks, and dangers incidental to the risks, of his employment, which were obvious to him, or were so open and notorious as to be obvious to him, and which were assumed by him.

The reply was a general denial. The plaintiff had a verdict of $30,000 which was reduced by *remittitur* to **$20,000.**

The defendant assigns error in the refusal of the court to give defendant's instruction in the nature of a demurrer to the evidence. This is urged upon two grounds which will be considered in the order of their presentation by defendant. The first is, that the evidence shows that whatever injuries plaintiff sustained were caused by his own act in the operation of the train in violation of the rules with which he was thoroughly familiar.

At the time of his injury, the plaintiff was twenty-five years of age, and had been employed as switch foreman for about two years, and prior to that, employed as a helper in the same kind of work for about two years. He testified that as the train he was conducting proceeded along track 52, the light on signal bridge 17 was green, "which," he said, "means clear, proceed ahead." There is no dispute as to the fact that the light was green at that time. The plaintiff's train proceeded beyond signal bridge 17 about the distance of a city block to the point of collision with the engine of the other train—engine 96—which was standing on track 52. The plaintiff testified that his train was moving at a speed of about fifteen miles an hour, which was the usual speed for such operations; that after passing signal bridge 17 the track curved somewhat northward, and that there was an embankment ten or fifteen feet high near the track; that porters of the dining cars frequently threw refuse out of the cars over on this embankment which rolled on to the track, rendering the track along that place sloppy and wet; that there was at this time considerable smoke at the place from a Missouri Pacific engine. There were a large number of tracks along that place. Plaintiff said he discovered the engine with which his train collided was on track 52, when he was about ninety or one hundred feet away from it; that the headlight of this standing engine with which he collided was thrown downward at the time, and could not be seen more than three or four car-lengths; that he had the tail hose in his hands during the movement described, and when he saw the light of the locomotive with which he collided, he pushed down the angle cock of the air hose, and it opened up the air. The

plaintiff in his testimony described the immediate circumstances of the collision as follows:

"After I passed bridge No. 17 I was looking out forward on the track and didn't see anything and began to turn the curve, and all at once I seen a headlight and I applied the air emergency and the train began to jump and slide, so I knew it wasn't going to stop before it collided, so I tried to get off the car and I crossed over the gate and got my foot down under the trap door on the step and my feet slipped; I fell and my clothing hung on some parts of the coach. I tried to pick myself up again, but it was too late; they collided already."

The plaintiff said that when he first discovered that this engine was on the same track, it was distant from him "between eighty and ninety, or a hundred feet," and that as soon as he discovered it he applied the air brake. The testimony further shows that at a point about fifty or sixty feet south of signal bridge 17, and about one-half block west of where the collision occured, the defendant maintained a signal tower in which a signal and lever operator was stationed. The tower so placed was called tower No. 2, and the block signals on bridge 17 were controlled by the man stationed in this tower. To change the signals the tower man had merely to push a button, and move a lever a few inches. This tower was high up above the ground, had windows on all sides, and afforded a view of the surroundings, and there was evidence that there was no obstruction to the view between this tower and the train standing in the block on track 52 with which plaintiff's train collided.

Defendant produced testimony that in transferring cars from the Atlantic Street yards on track 52, the yard-master at the Atlantic Street yards would not telephone to the tower man in tower No. 2 unless the train proceeding was to be diverted from track 52. The trip from the yards to the station ordinarily took seven or eight minutes. The train with which plaintiff collided was a train of passenger coaches, which had left the Atlantic Street yards about sixteen minutes before plaintiff's train started on its trip, and this other train had been stopped in the block a short distance east of bridge 17 as has been heretofore stated.

The plaintiff introduced in evidence the block signal rules and definitions, and certain governing rules for trainmen and levermen operators as follows:

" 'Block Signal Rules.

" 'Definitions.

" 'Block. A length of track of defined limits, the use of which by trains is governed by block signals.

" 'Block Station. A place from which block signals are operated.

" 'Block Signal. A fixed signal governing the use of a block.

" 'Home Block Signal. A fixed signal at the entrance of a block to govern trains in entering and using that block.

" 'Manual Block System. A series of consecutive blocks, governed by block signals operated manually, upon information by telegraph, telephone or other means of communication.

" 'Signal Indications.

" 'Position, horizontal; color, red; occasion for use, the signal will appear when block is not clear; indication for enginemen and trainmen, stop, or stop and proceed; name as used in the rules, stop-signal, or stop-and-proceed signal.

" 'Position, diagonal; color, yellow; the signal will appear when block is clear; second block in advance is not clear; approach next home signal prepared to stop; caution signal.

" 'Position, vertical; color, green; the signal will appear when block is clear; indication for enginemen and trainmen, proceed; name as used in the rules, clear signal.

" 'Train Directors, Levermen, Levermen-Operators.

" '612. Levers, or other operating appliances, must be used only by those charged with that duty and as directed by the rules.

" '613. When the route is set the signals must be operated sufficiently in advance of approaching trains to avoid delay.

" '614. Signals must be restored so as to display their most restrictive indications as soon as the front end of a train or engine for which they were cleared has passed, except a train being followed by an engine which is to act as pusher.

" '626. They must observe all passing trains and note whether they are complete and in order; should there be any indication of conditions endangering the train, or any other train, they must take such measures for the protection of trains as may be practicable.

" 'Engineermen and Trainmen.

" '669. Trains or engines stopped by the leverman in making a movement through an interlocking plant, must not move in either direction until they have received the proper signal from him.

" '671. When two or more than two lone engines, or a train following a lone engine, stop at an interlocking stop signal, the signal must be changed for each movement, but not otherwise.

" 'Leverman-Operators, Telegraph-Telephone Block and Staff Operators.

" '736. They will receive instructions from and report to the passenger trainmaster in matters pertaining to interlocking operations and train movement, and to the superintendent of telegraph in all other matters; be under the immediate supervision of the dis-

patcher, or of those employed in higher classes at the interlocking station or telegraph-telephone office; familiarize themselves with the rules and general instructions; call to each other every train movement to be made and repeat all calls to insure a thorough understanding.' "

The defendant also introduced certain other rules. Since the plaintiff testified that he was familiar with the rules of defendant, and it is claimed that the evidence shows his injuries were caused by his own act in the operation of the train in violation or disregard of the rules, these further rules introduced by defendant are also set out. They are as follows:

" 'Rule 109. A proceed signal or a train order does not insure an unobstructed track ahead, except through the tunnel. The tracks of these companies are virtually one continuous yard. Train movements are frequent but often irregular. Movements must be made with trains under control.

" 'Rule 105. Both the conductor or foreman and the engineman are responsible for the safety of the train and the observance of the rules, and, under conditions not provided for by the rules, must take every precaution for protection.

" 'Rule 101. Trains must be fully protected against any known condition which interferes with their safe passage at normal speed.

" 'When conditions are found which may interfere with the safe passage of trains at normal speed and no protection has been provided, such action must be taken as will insure safety.

" 'In foggy or stormy weather which obstructs the view, also when the view is otherwise obstructed, enginemen and trainmen must be especially alert, and trains must be moved under such control as to insure stopping within distance track is known to be clear; also approach stations and street crossings so as to avoid danger to persons and vehicles.' "

The defendant introduced several of its employees who testified to a rule, custom and practice in reference to the signal light on bridge No. 17. This testimony was to the effect that a green signal was on bridge No. 17 all of the time when the movements of trains were directly down track 52 or "52 lead;" that the only time this light would be changed to red, would be when there was to be a diverting movement to Twenty-first Street, and in that case the tower man of tower No. 2 would be called by telephone, from the Atlantic Street yards, and told that they "had a drag going to Twenty-first Street," and thereupon, he would throw the signal red, and reverse the switch; also testimony to the effect that the movement made with engine 96, the engine with which the plaintiff's train collided, was a regular movement, and one known to all the employees working in the Atlantic Street yards; and that at that

948

time, the movement made with engine 96 regularly preceded the movement of the train that plaintiff was on, and on the same track, and that the space of time between that movement and the movement of plaintiff's train was sixteen minutes; also, that the occasion for holding engine 96 on track 52 would be to allow the fast mail train to pull out, at about two o'clock, and that on this occasion, engine 96 was "probably held" from tower No. 1 to let the mail train out. On the other hand plaintiff's testimony was that it was the custom and practice that "the signal on bridge No. 17 over track 52 show red, be kept red, at a time when a train was proceeding eastward on track 52, and another train was in the block between bridges No. 17 and No. 9; that he had always found it that way; that this had been the custom during the whole four years in which plaintiff had worked there, and that he relied upon it being so in this instance; that he was always told to proceed, to go ahead, "when you have a clear signal, and stop, when you get a red signal." Upon the definitions and rules set out, and upon this oral testimony, rests determination of the question whether it must be said plaintiff's injury was due solely to his own negligence, and disregard of the rules, custom and practice.

The plaintiff testified that he was familiar with these rules, which were in force at the time in question. Upon the point under immediate consideration, counsel for defendant argue that under the rules and plaintiff's admitted familiarity with them, especially rules 109, 105 and 101, the collision was solely due to plaintiff's own act in disregard of the rules, and that under the evidence the court should have so declared as a matter of law. The argument proceeds upon the premise that under the evidence the leverman was under no duty to change the signal from green to red by reason of the fact that engine 96, with a train attached, was standing on track 52 and within the block which plaintiff's train entered in passing signal bridge 17, and upon the further premise, that although the green or proceed signal appeared on bridge 17 the plaintiff was solely responsible for his own safety and the safety of his train in entering that block. Printed rules largely speak for themselves. These rules and the definitions forming a part of them must be construed together. They proscribe the respective and correlated duties of two classes of defendant's employees—those whose duty it is to observe and direct the movements of trains by signals or otherwise, levermen and others, and those also who are in the immediate control of trains, as enginemen and switch foremen.

It is admitted that the green signal appeared on bridge 17 upon the occasion in question, and in consideration of that fact and of the rules, it must be concluded that there was evidence of violation of

the rules by defendant's levermen or towermen. Rule 612 requires the levermen to operate the appliances as directed by the rules. It is only necessary to refer to the explanation of "signal indications," set forth in the printed rules and stating that the green signal will appear when the block is clear and is an indication for enginemen and trainmen to proceed, that the red signal will appear when the block is not clear, and that as used in the rules, it is a stop signal or stop-and-proceed signal. These "signal indications" enter into the subject-matter of the rules, and are to be construed with rule 612, to the effect that levermen must operate their appliances as directed by the rules; also, with rule 614, that signals must be restored so as to display their most restrictive indications as soon as the front end of the train or engine, for which they were cleared, has passed; and they must be construed with rule 626, which makes it the duty of a leverman to observe all passing trains, and to note any indications of conditions endangering the train, or any other train, and take such measures for the protection of trains as may be practicable. The court could not say, as a matter of law under the printed rules, that there was no violation of those rules by defendant's employee upon the occasion in question, nor so hold under the oral testimony given by plaintiff and defendant's employees, as to the custom, rule and practice under the circumstances described. As to the oral testimony, there was conflict, but for the purpose of the demurrer the plaintiff's testimony is to be taken as true. This must be done under a rule so well established that citation of authority is unnecessary. [Hall v. Coal & Coke Co., 260 Mo. 351, 365.]

Counsel for defendant particularly emphasize rule 109 and seem to regard it as a modification or displacement of the other rules under consideration. Rule 109 to the effect that a proceed signal does not insure an unobstructed track ahead, does not nullify or make meaningless the rule which provides that the green signal will appear when the block is clear and which is an indication for trainmen to proceed; nor destroy the other rule that the red signal will appear when the block is not clear; nor, the rule that the levermen operators must observe passing trains, and the indication of conditions endangering the train, and take measures accordingly. Rule 109 is a rule which is in the nature of a caution to trainmen—a statement of conditions existing—and enjoins upon them a duty. This is apparent from its language, that a proceed signal does not insure an unobstructed track ahead except through the tunnel, followed by the statement that the tracks are virtually one continuous yard, and that train movements are frequent but often irregular. Having stated those conditions, there follows the statement that movements must be made with trains under control.

We think the trial court did not err in refusing to hold as a matter of law, that the plaintiff violated rules 101, 105 and 109, and that

his violation was the sole cause of his injury. There is conflicting testimony pertinent to that question. The defendant had testimony that plaintiff's train was moving at a speed greater than the usual speed in that character of operation, and that plaintiff could have seen the engine with which his train collided sooner than he did. But, plaintiff's testimony was that his train was moving at the usual speed; that he was in his proper place keeping watch of the track, and had the tail hose in his hand ready to act, discovered the engine of the other train as soon as he could do so under the conditions existing, and upon doing so immediately acted. Whether he was negligent or not was a question for the jury.

It is to be borne in mind that if the plaintiff was guilty of negligence contributing to his injury his such negligence would not bar a recovery, if defendant's leverman was also guilty of negligence contributing to cause the plaintiff's injury. Under the terms of the Employers' Liability Act it is only when the negligent act of the plaintiff is the sole cause of his injury and the defendant's act is no part of the causation, that the defendant is free from liability. The plaintiff's negligence operates to diminish the damages he may recover, but not to defeat him entirely. [Federal Employers' Liability Act, 45 U. S. C. A. sec. 53; Grand Trunk, etc., Railroad Co. v. Lindsay, 233 U. S. 42; Illinois Central Railroad Co. v. Skaggs, 240 U. S. 66; Auchenbach v. Railway, 8 Fed. (2) 350.] The hypothesis of the plaintiff's negligence, and consequent diminution of damages, was submitted by the instruction authorizing recovery.

The liability of defendant for plaintiff's injuries could be reasonably predicated upon the negligent failure to show any signal of warning and upon the maintenance of the green signal at the time and place in question. The conclusion is warranted under the evidence that without this omission of duty the collision would not have occurred [Ward v. Dry Goods Co., 248 Mo. 348, 370; Hayes v. Railroad, 111 U. S. 1. c. 241.] Under the evidence the question whether defendant was negligent in maintaining the green signal at the time plaintiff's train entered the block and when the other train was standing within the block, was one for the jury. This is so in consideration of the printed rules, and the testimony as to the customary practice followed in the operation of the trains and signal lights in the movement described. [Halt v. Cleveland C. C. & St. L. Ry., 279 S. W. 148; De Clue v. Mo. Pac. Ry., 264 S. W. 992; McGovern v. Philadelphia & Reading Railroad Co., 235 U. S. 389; Hill v. K. C. S. Ry. Co., 182 Mo. App. 380; St. Louis & S. F. Ry. Co. v. Jeffries, 276 Fed. (C. C. A.) 73.]

Counsel for defendant in support of their contention that the evidence shows that whatever injuries plaintiff sustained were caused by his own act in the operation of the train in violation of the rules, have cited Toledo, St. Louis & Western Railroad v. Allen, 276 U. S. 165; Randall v. B. & O. Railroad Co., 109 U. S. 478; Aerkfetz v. Humphreys, 145 U. S. 418. We think the facts in those cases are so materially different from the facts in the instant case that the rulings in those cases cannot be regarded as controlling of the determination of this case.

Toledo, St. Louis & Western Railroad v. Allen, was on certiorari to review the judgment of this court in Allen v. Ross, 292 S. W. 732. The plaintiff was a car checker, and in his work which at the time of his injury was being done in the nighttime, he moved about the yards of the railway company. Some cars were shunted, and made to move upon a track very near that at which plaintiff was engaged, and these cars being unlighted and unattended, and no person warning him of their approach, he was struck and injured. The opinion of the Supreme Court of the United States discusses the various grounds on which it was held the Railway Company was not liable. One was the question of the failure to sound the whistle or ring the bell of the engine which gave the impetus to the cars in question. As to this, the court said at page 171, that when the cars were detached, plaintiff was some three or four hundred feet from the lead track, and the engine was at the other end with a string of cars, that the injury occurred in the railroad yards where there was ringing of bells and sounding of whistles on trains going and coming, and in that situation it was held that the ringing of the bell of the engine would have simply tended to confuse. It was also held that under the evidence the plaintiff knew how the switching was done at that place; and, that there was no evidence that he was exposed to unusual danger by reason of any departure from the practice generally followed. In the respects just mentioned the opinion cites and follows the prior ruling of that court in Aerkfetz v. Humphreys, supra. The opinion also proceeds upon the theory that there was no evidence that the employees of the defendant in charge of the engine and cars, saw, or by the exercise of ordinary care could have seen the plaintiff, in time to have stopped or slackened the speed of the cars, and avoided injury. Certainly, there is a clear distinction between that case and the one at bar upon the question of giving any warning signal. In that case the plaintiff was moving about in the performance of his work, and in such manner that the employees operating the train and switching cars, could not readily follow his movements, and could not in any way readily warn him by the bell or whistle of the engine. In the case at bar the plaintiff was proceeding upon a fixed track; and, ac-

cording to the evidence in his favor, proceeding in reliance upon a signal which could be seen and was seen by him; and the meaning of that signal and the duties of the plaintiff and of the leverman under the circumstances, were the subject of rules and of a custom and practice, in the performance of that kind of work. The contention of defendant that the demurrer should have been sustained on the ground that plaintiff's own negligence was the sole cause of his injury is overruled.

It is next insisted that defendant's demurrer should have been sustained on the ground that there is no evidence showing that the particular movement in which plaintiff was engaged at the time of his injury was an interstate movement. Upon that our attention is called to Illinois Central Railroad Co. v. Behrens, 233 U. S. 473; Erie Railroad Co. v. Welsh, 242 U. S. 303; Lehigh Valley Railroad Co. v. Barlow, 244 U. S. 183; New York Central Railroad v. Carr, 238 U. S. 260; Chicago, B. & Q. Railroad v. Harrington, 241 U. S. 177. From what we have heretofore stated, it appears without contradiction that of the cars involved in the movement in which plaintiff was engaged, some were to be placed on the track of the Illinois Central Railroad Company and the others on the track of the Chicago & Eastern Illinois Railroad Company at Union Station, and thence, according to the regular schedules of those companies, later, on the same morning, those cars would proceed to their respective destinations in the State of Illinois. The evidence is such that it must be presumed that these cars, when moved from the Atlantic Street yards had already been assigned or designated for interstate movements in being placed on the respective tracks at the Union Station. In the Behrens case the injured party was a fireman and with a switching crew was engaged in moving several cars loaded with freight which was wholly intrastate, from one part of the city of New Orleans to another part of that city. The same crew upon completing that movement was to have gathered up and taken to other points several other cars as a step or link in their transportation to various destinations within and without the State. In that case it was said that the crew handled interstate and intrastate traffic indiscriminately, frequently moving both at once and at times turning directly from one to the other; but the significant thing was that at the time of the collision which injured the plaintiff, the crew was moving a car loaded with freight which was wholly intrastate. Upon those facts it was held that the injured fireman was not engaged in interstate commerce. The court said, quoting from Pederson v. Delaware, L. & W. Railroad Company, 229 U. S. 146: "The true test always is: Is the work in question a part of the interstate commerce in which the carrier is engaged?"

In Erie Railroad Co. v. Welsh, supra, a yard conductor on an in-
terstate railway was injured while alighting from a moving freight
engine for the purpose of reporting to the yard master for further
orders, having executed all previous orders.   It was held that he was
not employed in interstate commerce, although the orders which he
would have received had he not been injured, would have required
him immediately to make up an interstate train.   It was held that
at the time of his injury he was not performing an act so directly
and immediately connected with his previous act, as to be a part of
it or a necessary incident thereto.   The court again said, at page 306,
referring to the true test of the Employers' Liability Act: "By the
terms of the Employers' Liability Act the true test is the nature of
the work being done at the time of the injury, and the mere ex-
pectation that plaintiff would personally be called upon to perform
a task in interstate commerce is not sufficient to bring the case within
the act," citing the Behrens case.

In Lehigh Valley Railroad v. Barlow, supra, the party was injured
while a member of a switching crew placing cars loaded with coal
belonging to the railroad company upon an unloading trestle.   The
cars, some days before, had passed over the company's line from a
point outside the State, and had remained upon the siding or switch,
before removal to the trestle, for unloading.   In that case the inter-
state movement of the cars had terminated when they were placed up-
on the siding.

In New York Central Railroad v. Carr, supra, the injured em-
ployee was a brakeman on a freight train running between points in
the same State, but the train contained some cars loaded with inter-
state freight.   He was injured while attempting to set the brake
on an intrastate car, which had been cut out of the train and backed
onto a siding.   It was held that he was employed in interstate com-
merce at that time, for the reason that the setting of the brake by
him was necessary in order that the engine to which the car was
attached, might, when uncoupled, return to the train and proceed
on its journey.

In Chicago, B. & Q. Railroad v. Harrington, supra, the injured
employee was a member of a yard switching crew, and at the time
of his injury was engaged in switching loaded coal cars belonging
to the railway company from a storage track to a coal shed of the
company for use in its locomotives.   Although the coal thus being
placed was to be used for locomotives employed in interstate hauls,
it was held that there was no such direct relation to interstate trans-
portation in the taking of the coal to the coal chute, as to make that
operation a part of interstate commerce.

The recent decision in LaLone v. Terminal Railroad Company,
316 Mo. 835, is decisive of the question now under consideration.

In that case the plaintiff's husband died from injuries received while he and others were engaged in the movement of empty freight cars to the freight house of the St. Louis-San Francisco Company in St. Louis. Some of the cars in the movement were to be immediately loaded with freight for shipment into other states. It was held that the movement was a preparatory movement, in aid of the interstate movement and a necessary incident to that movement, and so closely connected with it as to be a part of it. In the case at bar the defendant, through its employees, plaintiff and others, was engaged in moving the cars from the Atlantic Street yards to their places on tracks in Union Station, a necessary step, incident, and preparation for the movement of those cars on the same morning into another State. In the LaLone case the cars being moved were freight cars. In the instant case they were passenger cars. In all controlling respects the movement was identical in character and purpose with the movement in this case. After reference to numerous cases, it was said at page 840:

"Respondent admits that it is a common carrier engaged in both intrastate and interstate commerce, but denies that it was engaged in interstate commerce at the time LaLone was injured. Obviously, respondent was engaged in interstate commerce when it moved cars loaded for destinations outside this State from the Frisco Broadway freight house to its Twenty-third Street yard. Is it not just as plain, and quite within the reasoning of the above cases, that the movement of these same cars in their empty condition from the Twenty-third Street yard to the Broadway freight house for the purpose of being immediately loaded thereat with interstate freight and immediately moved therefrom in interstate commerce, was *a preparatory movement in aid of, a necessary incident to, for the purpose of furthering, and so closely connected with* the movement of these same cars when loaded with interstate freight as to be a part of such interstate movement?"

The contention of defendant under consideration is overruled.

The defendant assigns error in giving of plaintiff's Instruction 1, as modified by the court. It is urged that "it is erroneous in that it allowed a recovery for a violation of the rules of [by] respondent, whereas such violation was knowingly made by respondent." The rule referred to as violated is rule 109, heretofore set out and discussed, and the question raised by defendant under this contention is the same as that raised on the demurrer to the evidence. No authority is cited under this point, and no new suggestion is made. The objection is overruled.

The only additional point stated is, that we should weigh the testimony upon the question whether the green signal on bridge No.

17 did not mean an unobstructed track. The weight of the testimony was for the jury. The allowance of this contention of defendant would involve a rejection of the testimony of the plaintiff and an acceptance of the testimony for defendant upon the question of the custom and practice, and also upon the question of the care exercised by the plaintiff. This contention is also denied.

It results from the foregoing that the judgment must be affirmed. *Seddon* and *Ellison CC.*, concur.

PER CURIAM:—The foregoing opinion by LINDSAY, C., is adopted as the opinion of the court. All of the judges concur.