HERBERT L. HOUGH v. CHICAGO, ROCK ISLAND & PACIFIC RAILWAY
COMPANY, Appellant.—100 S. W. (2d) 499.

Division One, December 14, 1936.

*Luther Burns* and *Culver, Phillip, Kaufmann & Smith* for appellant.

*Prince & Beery* and *E. H. Gamble* for respondent.

FERGUSON, C.—Plaintiff brought this action in August, 1931, in the Circuit Court of Clinton County, for ·damages, in the amount of $50,000, for personal injuries which he alleges he sustained, on February 11, 1930, in the course of his employment as a switchman in defendant's railroad yards at El Reno, Oklahoma. The jury found for defendant. The trial court sustained plaintiff's motion for a new trial on the ground of error in giving certain instructions requested by defendant and defendant has appealed from the order granting a new trial.

Defendant as appellant here contends, first; that plaintiff did not make a submissible case, that its demurrer to the evidence, at the conclusion of all of the evidence in the case, should have been sustained and that error, if any, in the instructions given at its request is immaterial. Appellant's further contention is that if it be held

that a case was made for the jury that its instructions F, G, and H, the giving of which the trial court specified as grounds for granting a new trial, are not erroneous and that plaintiff as respondent here has not met the burden of pointing out any other ground set out in his motion for a new trial upon which it ought to have been sustained.

In determining whether, under the evidence, a case was made for the jury we must of necessity ascertain the issues involved and review the evidence. El Reno is a division point of the defendant railroad company and extensive yards are maintained there. In that part of the yard involved there were at the time of the accident thirty parallel east and west tracks numbered from the south, the southernmost track being numbered 1, with vacant space south thereof within the yard bounds for additional yard facilities. After the date of the alleged injury five additional parallel tracks were constructed in this space south of the former track 1 resulting in a renumbering of all the tracks from the southernmost track. However, we look to the situation as it existed at the time. Tracks then numbered 10 and 11 are involved. As the writer understands the evidence construction of the tracks south of track 11, being 1 to 10 inclusive, had been completed some two or three months prior to the time of this accident and had since been in use. These tracks were referred to, by plaintiff, as the "front yard" and plaintiff claims his work was principally confined to this "front yard." At the same time a "crossover" from track 11 was constructed and two new switch stands installed alongside and south of that track and had therefore been in use some two or three months. Thereafter track 11 "was used for a main line through the yards" so that "road engines" coming in from a run "could come down that line to the roundhouse." There was evidence, that these two newly installed switch stands were about fourteen or fifteen feet apart; that the west stand, which plaintiff says contributed to his injury, was thirty-six and one-half inches south of the south rail of track 11, and the east stand approximately the same distance south of the rail; that the projection or "overhang" of the type of engine and tank involved was twenty-six inches and the clearance ten and one-half inches; that the "inside surface" or north side of the lamp at the top of the west stand was but two feet nine and one-fourth inches south of the south rail of the track which would leave a clearance of only seven and one-fourth inches; and that the top of the west switch stand was thirty-three inches above the top of the rail and the bottom of the sill step of a tank or tender, or "stirrup" on the side of a car, eighteen and one-half inches above the top of the rail. Plaintiff testified that these two switch stands were "about the same height as other switch stands in the yard" but "the usual and ordinary distance of the other switch stands in those yards" from the track (nearest rail) was from

sixty to sixty-five inches; that he did "not know of any other switch stand in the yard that was as close to the track as this one" (the west stand); that he did not know "it set that close" until after the accident; that it was a custom when a switch stand or other construction was so placed in the yard as to constitute an obstruction, or be a source of danger, to post a warning bulletin on the bulletin board; and that he read bulletins as posted, "regularly watched the board," and never saw any warning or notice relating to these stands. In this connection plaintiff testified that while his work was principally on tracks south of track 11 it often took him on and along tracks north thereof and over track 11 but that he had never had occasion to use this switch and "never went over this crossover." His testimony was to the effect that he had no prior knowledge of the proximity of the switch stands to the track.

There are but two witnesses as to how the accident occurred, plaintiff and defendant's brakeman, Streams. Their versions are contradictory. Plaintiff was working on a midnight to eight A. M. shift. Shortly before eight o'clock on the morning of February 11, 1930, plaintiff completed his work on track 8 in connection with the making up of a train bound for Fort Worth, Texas; he then started to the yard office "to report to my foreman and if there was no more work I was going home." The yard office was slightly northeast of track 8 and plaintiff went north to track 10 intending to walk between tracks 10 and 11 the distance of "about a quarter of a mile" to the yard office. He crossed track 10 at a point about opposite the east switch stand on the south side of track 11 above described. As he approached track 10 he observed a road engine and tender coming from the west and backing east" on track 11 "on its way to the roundhouse." It is conceded that this engine had been detached from an interstate freight train which it had drawn into El Reno. Brakeman Streams of the engine crew "was standing on the north end of the footboard (of the tender) on the engineer's side." Both the switches were against "the movement of the engine" and as plaintiff was crossing track 10 the engine came to a stop about fifteen feet west of the west switch stand to permit the brakeman to "line" the switches. Both plaintiff and Streams testified that "it was customary for switchmen (in the yard) when they were around to line (operate the switches) for train crews through the yards," that "it would save the brakeman the work and time of getting off his engine and coming down to the switches and throwing them." Having crossed track 10 at a point opposite the east switch and observing that the switches were "against the movement" plaintiff "lined" the east switch and then "walked back to the west switch and lined it." Streams did not get off the tender. Plaintiff testified that "all the time" he was "lining" the switches he and Streams were engaged in conversation; and that: "When I lined the west switch I stepped right

on around the west side of the west switch, over to the middle of the track (11), and advanced toward the engine with the intention of getting on the engine footboard, while the engine stood still; the ties were above the ground there. It was not smoothed off, and in advancing toward the engine I glanced down where I was walking, and when I again raised my eyes the engine was in motion, and I jumped back to the south to try to clear myself and to get off the track, but it looked like to me that the engine was right on me, and I reached up with my left hand and grabbed hold of the grab iron on the southeast corner of the tank, and in so doing, the engine speed swung my body to the side of the tank; and with the engine increasing speed all of the time, before I could regain my footing to get myself to safety, I was dragged across the switch stand (the west stand); that broke my hold on this grab iron, causing me to fall down, and in so doing, some part there, the step, or journal box struck me in the back as the engine tank passed me.'' Plaintiff further testified that in going to the roundhouse the engine would pass in front of the yard office and it was his intention ''to get on the engine for the purpose of riding to the yard office;'' that ''it was the general practice for switchmen to ride road engines and trains through the yards to and from their jobs wherever they had occasion to go in the discharge of their duties;'' that as he walked between the rails of track 11, along ''the middle of the track'' toward the standing engine ''and before he glanced down'' Streams, standing on the north end of the footboard on the back of the engine tank, ''was looking at me and I was in conversation with him;'' that he (plaintiff) did not give any signal nor see any signal given but when he glanced up the engine was moving toward him; and that it is the custom when a switchman or trainman is walking toward the footboard of an engine, as he was, with the intention of boarding the engine ''to let the engine stand still until he gets on.''

Streams, the only other eyewitness, as a witness for defendant, relates an entirely different version of the happening. He testified that plaintiff did not at any time get upon the track and walk along the track toward the tender. He says that as the engine stopped west of the switch stands he saw plaintiff at the switch stands in the act of throwing a switch; that there was no conversation whatever between him and plaintiff; that plaintiff having lined the switches and while standing ''at the south side of the track between the two switches . . . gave me the back-up signal and I gave it to the engineer;'' that plaintiff remained standing in that position on the south side and clear of the track between the two switch stands and ''as we got even with Mr. Hough he tried to get on the engine tender-tank;'' that ''he (plaintiff) started to grab hold of the grab iron and he went around out of sight like something had knocked him off . . . kinda to the side of the tank and I saw he was in trouble and

gave the engineer" an emergency stop signal; that the engineer "made a quick stop;" that he found plaintiff lying on the ground at the side of the track "up about the cylinder head of the engine;" that he did not know that plaintiff intended to get on the engine; that nothing was said or done by plaintiff to indicate such intention and that he "had no intimation or belief he (plaintiff) was going to try to get on the tender."

This action is under the Federal Employers' Liability Act which makes the railroad company "liable in damages" to an employee "suffering injury" while employed in interstate commerce, as therein defined, when the injury results "in whole or in part from the negligence of any of the officers, agents or employees of such carrier," etc. The applicability of the act is not questioned and as the cause was tried on that theory and is briefed here by both parties, without question, as being within the act we shall so consider it. Plaintiff's petition assigned negligence as follows: (1) dangerous proximity of the switch stand to the track; (2) "unnecessary" and dangerous height of the switch stand; (3) failure to warn of the location of the switch stand; (4) starting the engine while plaintiff was upon the track, between the rails, walking toward, intending, and about, to step on the footboard, and (5) accelerating the speed of the engine after plaintiff had seized the grab iron thereby "swinging him against the switch stand before he could gain a place of safety." Defendant's answer denies that plaintiff's injuries, if any, were caused by its negligence or that of its employees and alleges that "whatever injuries plaintiff sustained, if any, resulted from his own negligence" in attempting to board the moving engine under the circumstances and in the manner shown by Streams' testimony and defendant's evidence and further that if the "switch stand mentioned in plaintiff's petition was dangerously close to the track," etc., plaintiff assumed that risk.

As to the demurrer to the evidence we could hardly hold, upon the evidence and as a matter of law, as defendant urges, that plaintiff assumed the risk arising from the dangerous proximity of the switch stand to the track and certainly not that he assumed the risk arising from the movement of the engine when he was, according to his testimony, advancing in the middle of the track, toward it, in plain view of the brakeman, whose signal controlled the starting of the engine, with the obvious and apparent purpose and intention of getting on the footboard of the tender. To sustain defendant's motion for a directed verdict the court would be required to discard and disregard plaintiff's positive testimony and accept and rule the motion on Streams' testimony and the evidence most favorable to defendant. Without extending this discussion we think the statement of the evidence we have made sufficies to show a submissible case was made and that there were issues of fact for the jury.

1178

■ This brings us to the question of error in the giving of certain instructions on the part of defendant specified by the trial court as ground for the granting of a new trial. Plaintiff's testimony was positive as to the cause and manner of his alleged injury; that having thrown both switches, the west switch last, he stepped around and to the west of the west switch stand and upon the track; that he then walked west in the middle of the track toward the standing engine; that Streams was looking at him and conversing with him as he advanced toward the engine; that the engine was started and in an attempt to save himself by getting on the engine he "grabbed hold of the grab iron on the southeast corner of the tank" and tried to get his "foot in the stirrup" but at that instant the speed of the engine was increased causing his body to swing to the side of the tank and he was "dragged across" the west switch stand, which "broke" his "hold on the grab iron causing" him "to fall" to the ground at the side of the track. We have recited the evidence most favorable to plaintiff's contention that the west switch stand was dangerously close to the track. Defendant had evidence that both switch stands were at a safe distance from the track allowing safe and ample clearance for trainmen or switchmen riding on the side of cars or engines and were at the same, and usual distance, from the track of other switch stands in that yard. All the evidence is that they were of about the same height as the other switch stands in the yard. Defendant also had evidence that it was highly dangerous for a trainman or switchman to attempt to get on a car or engine moving toward a switch stand from a point near the switch stand and on the side thereof from which the moving car or engine was approaching and that it was the custom for the trainman or switchman to get on the car or engine after it had passed the switch stand. There was evidence, if accepted by the jury, sustaining defendant's theory that it was not negligent, nor its employee Streams, and that plaintiff's injury, if any, resulted solely from his own negligence. As noted defendants had evidence that the switch stands were located at a reasonably safe and usual distance from the track. Streams testified, that there was no conversation whatsoever between him and plaintiff; that when the engine stopped, the switches being against the movement, he saw plaintiff engaged in lining the switches; that having lined the switches plaintiff standing between the two switch stands and at the side, south and clear of track gave him the back-up signal which he relayed to the engineer; that as the engine moved east plaintiff remained standing in the same position but as the tender "got even" with plaintiff he attempted to get on the tender as it moved east toward and was then within a few feet of the east switch; that plaintiff "started to grab hold of the grab iron" and "he went around out of sight to the side of the tank, like something had knocked him off;" and thereupon he (Streams) gave the emergency

stop signal. It follows if defendant's evidence gives the true version of the situation and the event, which was for the jury, defendant and its employee Streams, were not negligent and plaintiff's own act was the sole cause of his injuries. That is the issue submitted ·to the jury by defendant's given instructions E and G.

While the record before us shows that the court granted a new trial on the ground of error in giving defendant's instructions F, G, and H, it seems to be conceded, and the briefs of both parties proceed on that theory, that defendant's instructions E, G, and H, were the basis of the trial court's ruling. Instructions E, and G, predicate certain facts according to defendant's version and advise the jury that if they find the happening occurred in that way and that plaintiff was negligent in trying to board the moving tender in such manner, under such circumstances and at such time and place "and that solely by reason of such negligence on his part (if you find he was thus negligent) plaintiff was injured," the verdict should be for defendant. We here observe that plaintiff's main instruction numbered 2, directing a verdict in his favor, set out in the conjunctive and required a finding of facts in accordance with his version. Plaintiff's Instruction 4, then told the jury, that "if you find the facts as stated in Instruction 2 (that is that defendant's negligence as therein hypothesized proximately contributed to plaintiff's injury), "then you must not find against plaintiff on the ground that he was himself guilty of any negligence that contributed to his own injury; but if from the evidence you find that plaintiff was himself negligent and such negligence directly contributed to produce his own injury, then you must diminish the amount of his recovery in the proportion that such negligence of the plaintiff bore to the combined negligence of himself and the defendant." Instruction 4 follows the provision of the Federal Employers' Liability Act (U. S. C. A., sec. 53) that "the fact that the employee may have been guilty of contributory negligence shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee." If therefore under plaintiff's Instruction 2 the jury found that negligence of the defendant, or its employee, proximately contributed, however slightly, to cause plaintiff's injury then negligence of the plaintiff, however great, proximately contributing thereto would not bar recovery by plaintiff but would operate only to diminish the damages recoverable, as stated in plaintiff's Instruction 4. While contributory negligence of the plaintiff does not bar recovery, however, if plaintiff's act is the sole cause of his injury and defendant's act is no part of the causation defendant is not liable (Mech v. Terminal Railroad Assn., 322 Mo. 937, 18 S. W. (2d) 510), and when, as in the instant case, defendant pleads and its evidence tends to show that it was not negligent in any of the respects charged against it and that plaintiff's act was the sole cause

of his injury certainly defendant is entitled to have that defense submitted to the jury by a proper instruction.

Complaint is not made as to the form of the so-called sole cause instructions, in this case, or that they do not hypothesize facts and require a finding of specific acts on the part of plaintiff, shown by defendant's evidence, as the sole cause of his injury. Plaintiff's position seems to be that it is error to give the so-called sole cause instruction in any case in which contributory negligence on the part of plaintiff (or a third party) is not a bar to recovery and that this court has so held citing a number of decisions which we shall review. The first of these cases, which is cited and quoted in the subsequent decisions dealing with a sole cause instruction, is Boland v. St. Louis-San Francisco Ry. Co. (Mo.), 284 S. W. 141, 145. In that case the instruction read: "If you find and believe from all the evidence in the case that the collision between the passenger train and the automobile described in the evidence was the result of the sole negligence of the driver of said automobile, then plaintiff (a guest) is not entitled to recover against the defendant and your verdict must be for the defendant." The court said: "Of course the defendant is not liable if its alleged negligence had nothing whatever to do with bringing about plaintiff's injury. But the cryptic way in which this information was conveyed to the jury was calculated, not to enlighten, but to confuse." It is evident that the court refers to the abstract manner in which the proposition is stated and it will be observed that the instruction hypothesized no specific acts on the part of the driver as being the sole cause of plaintiff's injury nor does it enumerate any facts which the jury are required to find. The opinion does not hold that if there is evidence upon which to base such a defense that it is error to submit negligence on the part of plaintiff, or a third party, as the sole cause of plaintiff's injury, to the jury, by an instruction properly predicating such facts. Gould v. Chicago, B. & Q. Railroad Co., 315 Mo. 713, 290 S. W. 135, was an action for damages by a soldier who was injured when struck by one of defendant's trains while he was guarding a bridge in the line of duty. "The case was submitted to the jury solely under the humanitarian rule." Defendant requested an instruction, which the trial court refused to give, to the effect "that, if plaintiff was not exercising care for his own safety and his injuries were caused solely by reason thereof, the jury should find for defendant." The opinion holds that the trial court properly refused the instruction for the reason: "There is no evidence tending to show that plaintiff's injuries were due to his sole act, independent of and not concurring with the alleged negligent act of defendant." Peppers v. St. Louis-San Francisco Railway Co., 316 Mo. 1104, 1114, 295 S. W. 757, was an action for damages by the parents of a minor child who was killed at a railroad crossing when defendant's train struck an automobile

in which she was riding as a guest. Plaintiffs relied upon primary negligence invoking both statutory and common-law negligence "with respect to ringing the bell and blowing the whistle." Defendant's position was that it was not negligent and that the negligence of the driver of the automobile was the sole cause of the collision. The verdict and judgment in the trial court was for defendant and plaintiff appealed. One of plaintiff's assignments of error, on the appeal, was directed to defendant's given Instruction 6. The instruction first declares the continuing duty of a driver of an automobile in approaching and crossing a railroad track and then reads: "So, if you find and believe from the evidence that said driver of said automobile attempted on the occasion mentioned' in evidence to drive over said tracks at said crossing without looking and listening then said driver was guilty of negligence; and if you further find and believe from the evidence that such negligence, if any, of said driver of said automobile was the sole cause of the death of said Mildred Peppers, then plaintiffs cannot recover, and your verdict should be for the defendant." This court said: "An examination shows the instruction is technically correct, as far as it goes, but it is misleading. It is true that, if the negligence of the driver of the automobile was the sole cause of the death of Mildred Peppers, then plaintiffs cannot recover. The instruction, however, does not embrace the entire situation, for it fails to inform the jury that the driver's negligence cannot be imputed to the deceased in determining whether his negligence was the sole cause of the collision. The whole evidence tends to show more than the negligence of the driver as the sole cause of the collision, for it may be inferred from it that the negligence of the defendant was either a concurring cause or the sole cause. If the instruction had explained to the jury that the negligence of the driver could not be imputed to plaintiff in determining whether his negligence, if any, was the sole cause of the collision, a different situation would have obtained. The instruction as given was error because it was misleading. Our ruling has the sanction of Boland v. Railroad (Mo.), 284 S. W. 141." In Shumate v. Wells, 320 Mo. 536, 9 S. W. (2d) 632, 635, plaintiff was injured when an automobile in which she was riding as a guest of the driver was struck by a street car, operated by defendant receiver, at a street intersection in the city of St. Louis. The case was submitted solely on negligence under the humanitarian rule. The verdict and judgment was for defendant and plaintiff appealed. We quote the following which is all that is said in the opinion about the sole cause instruction given at defendant's request: "Defendant's Instruction No. 6, told the jury that, if they believed plaintiff's injuries were 'solely caused by the negligence of the driver of the automobile,' she could not recover. An instruction similarly phrased was condemned in Boland v. Railroad (Mo.), 284 S. W. 141, and again in Peppers v. Railroad,

316 Mo. 1104, 295 S. W. 757.'' The next case in which a sole cause instruction is referred to is Smith v. St. Louis-San Francisco Railroad Co., 321 Mo. 105, 9 S. W. (2d) 939;, an action for damages for the death of James Haley who was killed when an automobile, owned and driven by another, in which he was riding as a guest, was struck by defendant's train. It was submitted on primary negligence. The verdict was for defendant and the trial court granted plaintiff a new trial on the ground of error in giving certain instructions at defendant's request among which was Instruction O as follows: ''If you find that the collision was wholly caused by the negligence and carelessness of the driver of the automobile in question, and defendant was not negligent in running and operating the train, then, and in either events, plaintiff cannot recover, and your verdict should be for the defendant.'' Without referring to the Peppers case, supra, but citing the Boland case, this court said, in reference to the instruction: ''Thus the jury was expressly authorized by the court to impute to Haley the negligence of the driver of the automobile, if any, they found, and thus the jury was further advised that, if the negligence of the driver was the sole cause of the collision, plaintiff was not entitled to recover in this action. It is now well settled in this State that the negligence of the driver of an automobile cannot be imputed to another occupant of the automobile, unless the relation between them was such that the driver's acts or omissions were under the law the acts or omissions of such other occupant of the automobile, or unless such other occupant of the automobile expressly sanctioned what the driver did or failed to do. [Boland v. Railroad (Mo.), 284 S. W. 141.]'' We have heretofore commented upon the Boland case. We come next to the case of Millhouser v. Kansas City Public Service Co., 331 Mo. 933, 55 S. W. (2d) 673. Plaintiff was injured when an automobile driven by another; and in which he was riding as a passenger or guest, was struck at a street intersection in Kansas City by one of defendant's street cars. The case was submitted under the humanitarian rule alone. The verdict was for defendant. The trial court sustained plaintiff's motion for a new trial and defendant appealed from that order. ''One of the instructions which the court gave for defendant, and for error in so doing granted plaintiff a new trial, was to this effect: 'The court instructs the jury that if you find and believe from the evidence that at the time and place mentioned in evidence the driver of the automobile in which plaintiff was riding was negligently and carelessly driving the same in an intoxicated condition; and if you further find and believe from the evidence that the collision between the street car mentioned in evidence and said automobile was caused solely by the negligence of the driver of said automobile in driving said automobile while in an intoxicated condition, if you find he was in an intoxicated condition, then plain-

tiff cannot recover and your verdict must be for the defendant.'" Our opinion in that case says: "It is clear, we think, that under this record the giving of this instruction was erroneous. . . . There was nothing for the jury to consider in this case except whether defendant was negligent under the humanitarian doctrine, as stated in plaintiff's instruction. . . . The chief reason . . . why this instruction is erroneous is that plaintiff's negligence, or that of the driver of the automobile, is no defense to defendant's negligence where plaintiff's case is based on a violation of the humanitarian rule, and an instruction in plaintiff's negligence has no place in the case. The only defense in a case properly submitted on the humanitarian rule is to disprove one or more of the basic facts on which that rule rests." The last statement restricts and confines the defense in a humanitarian case solely to the disproval of one or more of the elements upon which the humanitarian rule rests. But even in a humanitarian case may not the defendant offer evidence affirmatively showing that the acts of negligence of either plaintiff or a third party was the sole cause of plaintiff's injury and submit that issue to the jury by an appropriate instruction? [See the opinion in Doherty v. St. Louis Butter Co., 339 Mo. 996, 98 S. W. (2d) 742.] A later case of Borgstede v. Waldbauer, 337 Mo. 1205, 88 S. W. (2d) 373 (en banc), was an action by a widow for damages for the death of her husband who, while walking across the street, was struck and killed by an automobile at a street intersection in the city of St. Louis. The case was submitted to the jury solely under the humanitarian doctrine. The verdict and judgment was for plaintiff and defendant appealed. One assignment of error was to the refusal by the trial court of an instruction offered by defendant stating, and requiring a finding of, the facts in evidence according to defendant's version of the occurrence, which, if found by the jury, absolved defendant of liability. The divisional opinion (Division Two) in the case was adopted by the Court en Banc. The opinion states that: "A finding by a jury of the facts as contained in the instruction . . . was equivalent to a finding that deceased's negligence was the sole cause of the collision." Continuing the opinion holds: "In Missouri, under the humanitarian doctrine, a driver of a motorcar is required to exercise the highest degree of care in discovering a pedestrian in peril or danger. It is immaterial whether that peril was created by the negligence of the pedestrian. Contributory negligence passes out of the case when it is submitted solely under the humanitarian doctrine. (Citing cases.) However, the question of whether the negligence of the injured party, where it is made an issue in the case, was the sole cause of the injury remains in the case. A defendant in such cases has the right to have that issue properly submitted to the jury." Watts v. Moussete, 337 Mo. 533, 85 S. W. (2d) 487, was an action for damages by a guest in an automobile injured

in a collision between the automobile in which she was riding and defendant's automobile. Plaintiff alleged several specific grounds of negligence. The answer was a general denial, contributory negligence of plaintiff and a plea that plaintiff's injuries were caused solely by the negligence of Mabary, the driver of the automobile in which plaintiff was riding, in the manner set out therein. The verdict was for defendant, the trial court sustained plaintiff's motion for a new trial, and the defendant appealed therefrom. The trial court specified as ground for the order granting a new trial, error in giving defendant's Instruction 3 as follows: "You are further instructed, that if you find and believe from the evidence that the collision mentioned and complained of was proximately and solely caused by the negligence of the driver of the automobile in which plaintiff was riding, then you will find the issues for the defendants, but you are further instructed that the negligence of the driver of the automobile in which plaintiff was riding, is not to be imputed to plaintiff in determining whether said driver's negligence, if any, was the sole and proximate cause of the collision mentioned and complained of." It will be noted that while the instruction is so worded as to meet the objections to the instruction in the Peppers case, supra, it does not set out and require a finding of any facts or the specific negligence of the driver of the automobile set up in the answer and shown by defendant's evidence as being the sole cause of plaintiff's injury and for that reason this court held that the giving of the instruction was error. It was said: "A defendant in a negligence case, who invokes as a defense the negligence of a third party as being the sole cause of the injury complained of, should, in the instruction submitting that issue, submit the specific negligence of such third party which the evidence tends to support, whether such defendant has pleaded the specific negligence of the third party or has answered by a general denial as to the negligence charged against him. And of course, such an instruction, if the facts warrant, should clearly advise the jury that the negligence, if any, of the third party cannot be imputed to the plaintiff." This case clearly recognizes the right of defendant, upon evidence tending to show that the act of either plaintiff or a third party was the sole cause of plaintiff's injury to have such issue submitted to the jury by proper instruction.

As we view the foregoing decisions of this court they do not hold, as plaintiff seems to contend, that it is error to give a sole cause instruction in any case in which contributory negligence on the part of plaintiff, or a third party, is not a bar to recovery and we adhere to the opinion announced, supra, that it is not error to submit to the jury, by a proper instruction, the facts supporting a defendant's version of the occurrence, which, if accepted by the jury, warrant a finding that plaintiff's own acts, or the acts of a third

party, were the sole cause of plaintiff's injuries and absolving defendant of the negligence charged. We have heretofore noted that the form of the instructions is not assailed but we are not to be understood as approving their correctness in that respect. We hold merely that when there are facts in evidence upon which to base such an instruction defendant is entitled to have the issue submitted to the jury by a proper instruction. In this connection it might be well for defendant to examine its Instruction G, as to whether it sufficiently specifies facts upon which to base a finding that plaintiff "negligently attempted to board the tender" and which, if found by the jury, would absolve defendant of any negligence charged.

Defendant's Instruction H, is one of the instructions specified by the trial court as error. The instruction tells the jury that; "If you find from the evidence that none of the crew in charge of the engine and tender which plaintiff attempted to get upon . . . knew or by the exercise of reasonable care would have known that plaintiff intended to make such attempt then you cannot find in favor of plaintiff on the ground that the persons or any of them in charge of said engine and tender were negligent in starting the same before plaintiff had gotten thereon." The crew in charge of the engine and tender was composed of an engineer, fireman and the brakeman Streams. The engineer and fireman testified that they did not see plaintiff at the switches nor his subsequent movements; that plaintiff and the switch stands were on the opposite side of the track, engine and tender from the engineer and that the length of the tender obstructed the fireman's view. Plaintiff testified that the fireman and engineer could not see him. The instruction is in keeping with Streams' version, which it will be recalled was, that after plaintiff "lined" the switches he gave the back-up signal and remained standing between the switch stands and south and clear of the track; that plaintiff neither said nor did anything indicating he intended or wanted to get on the engine or tender and that, he, Streams had "no intimation or belief" that plaintiff intended doing so. On the other hand if plaintiff's version be accepted while it seems a reasonable inference that under such circumstances, Streams must have known when he gave the signal causing the engine to start that plaintiff, advancing, in the middle of the track, toward the standing engine, intended to mount the footboard nevertheless that was for the jury. Plaintiff (respondent) touches but briefly upon this instruction, merely saying at one place in his brief that it is a "singling" or "isolating" instruction and at another place that it is a "cause splitting instruction." While we do not approve, and have repeatedly condemned, instructions which single out, or comment upon, isolated and detached portions of the evidence and direct a verdict upon a finding thereon (and defendant's sole cause Instruction E, in this case, as framed, might well be examined from that view point), in view of the

several, separate assignments of error set out in the petition, the conflicting evidence, and the facts set out in plaintiff's main instruction the instruction does not appear to be prejudicial to plaintiff.

 In this motion for a new trial plaintiff assigned as error the giving of defendant's Instruction F. While not specified by the trial court as a ground of the order granting a new trial plaintiff urges here that under the state of the evidence in the case the instruction is error and highly prejudicial to him. The instruction reads: "If you find and believe from the evidence that plaintiff was struck and injured by the switch stand mentioned in evidence but further find and believe that at and before the time he was so struck and injured he was familiar with the location of said switch stand, and that plaintiff had full knowledge and was aware of the danger, if there was danger, of his being struck by such switch stand, *and that knowing of such danger (if you so find), he attempted to get upon the moving engine and tender at the time and place and in the manner which you find from the evidence that he did try to get upon said engine, then you are instructed that the plaintiff assumed the risk of being so struck* and you cannot return a verdict for plaintiff on the ground that said switch stand was dangerous by reason of its location or nearness to the track upon which said engine was moving at the time." (Italics ours.) There was evidence tending to show that plaintiff's work daily, since the installation of the two switch stands, took him into that part of the yard involved and along this track, defendant's evidence along this line being such, if believed by the jury, as to warrant an inference that if the switch stands were dangerously close to the track he must have known and been fully aware thereof. If the instruction had limited the jury to a finding that plaintiff "knowing of such danger attempted to get upon the moving engine and tender" at the time, place and in the manner described by Streams, that is, in accordance with defendant's evidence, a different situation would obtain and the instruction would not seem amiss. It will be recalled that defendant's version was that without any indication of an intention to do so, plaintiff, from a position between the two switch stands and south, at the side and clear of the track, attempted to board the tender as it, moving east, came "even with" him and that as plaintiff "started to grab hold of the grab iron he went out of sight like something had knocked him off." If the jury believed this testimony it might conclude therefrom that plaintiff was struck by the east switch stand and "knocked off." Now clearly if the east switch stand was dangerously close to the track and plaintiff knowing thereof, without going to the other or east side of the stand where he could avoid it, attempted to get on the tender moving toward and then within a few feet of the stand, and at the time, place and in the manner shown by defendant's evidence, he assumed the risk of being struck by the stand. But the instruction is not confined to that situa-

tion. It tells the jury (see italics above) that if plaintiff "knowing of such danger (the dangerous proximity of the switch stand to the track) *attempted to get upon the moving engine and tender at the time and place and in the manner which you find from the evidence that he did try to get upon said engine* then you are instructed that plaintiff assumed the risk of being so struck." (Italics ours.) If the jury believed plaintiff's version they would find, from the evidence, that plaintiff attempted to get on the moving engine "at the time and place and in the manner" as follows; that after the engine stopped he lined the west switch stand, walked around to the west side of the west switch stand and upon the track; that he walked west in the middle of the track toward the standing engine and tender intending to get upon the footboard of the tender and ride to the yard office; that he at no time gave any signal; that he was at all times in full view of Streams and conversing with him; that he momentarily glanced down; that when he looked up the engine and tender was moving toward him and was close upon him; that in an effort to save himself from being run down he "grabbed hold of the grab iron on the corner of the tank" and attempted "to get upon the moving tender;" and that as he "tried to get his foot in the stirrup" the "speed of the engine was increased" and he was swung to the side of the tender, struck against the west switch stand and caused to fall to the ground. This instruction tells the jury, in effect, that even though they believe plaintiff's statement of the occurrence and that defendant's brakeman negligently gave the signal starting the engine knowing that plaintiff was intending to get on the tender and that plaintiff was injured in the manner he claims as he was attempting to get on the moving tender in an effort to save himself that nevertheless if plaintiff prior to and at the time, in that emergency and under those circumstances, knew that the switch stand against which he struck was dangerously close to the track he "assumed the risk of being so struck." What we have said we think suffices to demonstrate that this instruction as worded is confusing, misleading and necessarily prejudicial to plaintiff.

Plaintiff's motion for a new trial assigned error in the giving of defendant's burden of proof, Instruction D and plaintiff renews the complaint here. The instruction reads: "You are instructed that the burden is upon the plaintiff to prove by a preponderance of the credible testimony every fact stated in plaintiff's Instruction No. 2, which would entitle him to recover a verdict, and unless the plaintiff has established said facts to the reasonable satisfaction of the jury by a preponderance of all the credible testimony, or if you find the evidence is equally balanced as to said facts, then your verdict will be for the defendant." The instruction tells the jury that unless the plaintiff has proved "by a preponderance of the credible evidence every fact stated in plaintiff's Instruction 2, which would entitle him

to recover a verdict'' their verdict should be for defendant. Plaintiff's Instruction 2, as we have heretofore mentioned, sets out plaintiff's version of the occurrence and hypothesizes in the conjunctive the facts bearing upon the various acts of negligence charged. Some of the facts, so enumerated, are incidental or collateral. The jury could fail to find or disbelieve some of the facts set out and yet upon the finding of other facts stated properly return a verdict for plaintiff; as for example the instruction permits a finding that the switch stand was dangerous because of height; the jury might not have believed this but have found, as the instruction authorized, that it was a dangerous obstruction on account of its location. But the instruction is so worded as to convey the idea that unless the jury found each and every fact set out in plaintiff's Instruction 2, their verdict should be for defendant, however a qualification is appended: ''which would entitle him to recover a verdict.'' Thus the jury is permitted to speculate as to what particular facts would entitle plaintiff to a verdict. Burden of proof instructions which have long been approved adequately and clearly define the law on the subject while the instant instruction, we are inclined to think, tends to confusion.

It is our conclusion that the order granting a new trial should be affirmed. It is so ordered. *Hyde* and *Bradley*, *CC.*, concur.

PER CURIAM:—The foregoing opinion by FERGUSON, C., is adopted as the opinion of the court. All the judges concur, except *Collet*, *J.*, not sitting.