SHERMAN S. GODSY v. GUY A. THOMPSON, Trustee of the MISSOURI PACIFIC RAILROAD COMPANY, Appellant.—No. 38628.—179 S. W. (2d) 44.

Division One, March 6, 1944.

Rehearing Denied, April 3, 1944.

682

*Thomas J. Cole, L. J. Bishop, D. C. Chastain* and *Patterson, Chastain & Smith* for appellant.

*Crouch & Crouch, James G. Kimbrell, Cowgill & Popham* and *Sam Mandell* for respondent.

██ BRADLEY, C.—Action under the Federal Employers Liability Act, 45 U. S. C. A., Secs. 51-60, to recover for personal injury. Verdict and judgment for $10,000 went for plaintiff and defendant appealed. .

Plaintiff was a switch tender, and, at the time of injury, was working in defendant's West Bottoms or Kaw Bridge Yards, Kansas City. The tracks in these yards extend generally east and west, and plaintiff was injured while between two trains moving in opposite directions. The negligence relied upon was the alleged violation of defendant's rule 30, which required, in switching movements, the ringing of the engine bell before starting up, and insufficient clearance between the two tracks.

The answer denied generally, and alleged that plaintiff did outside work, was not a bona fide employee, and for that reason should not recover, and that his own negligence was the sole cause of his injury. The reply was a general denial and an allegation that ''defendant at all times had full knowledge of any work being done by plaintiff outside of his rairoad duties and fully acquiesced therein.''

Error is assigned: (1) On the refusal of a demurrer to the evidence; (2) on instructions given and refused; (3) on the admission of evidence; (4) on the refusal to discharge the jury because of alleged prejudicial occurrences; and (5) on an alleged excessive verdict.

The demurrer to the evidence raised four questions: (1) Should plaintiff's outside work bar recovery? (2) Was plaintiff's negligence the sole cause of his injury? (3) Was the violation of rule 30 a proximate cause of plaintiff's injury? and (4) Was the clearance insufficient?

██ We shall first dispose of the question on the outside work. Plaintiff's hours with defendant were from 12:01 A. M. to 8:01 A. M. He was also employed by the A. J. Stevens Company as a wood finisher and on the day prior to his injury and for three weeks prior, he had worked for the Stevens Company from 8:30 A. M. to 4:30 P. M.,

686

for which he received $1.00 per hour. Defendant introduced in evidence railroad rules 700 and 703, which follow:

Rule 700: "Constant presence of mind to insure safety to themselves and others, is the primary duty of all employees. In furtherance of the objects of the several Federal and State 'Hours of Service' laws, employees affected by such laws are prohibited from using their time while off duty in a manner that may unfit them for the safe, prompt and efficient performance of their respective duties for the railroad. They are strictly enjoined and required to use their time off duty primarily for obtaining ample rest."

Rule 703. "Employees must be alert, devote themselves exclusively to the service, give their undivided attention to their duties during prescribed hours, reside wherever required, and obey promptly instructions from the proper authority in matters pertaining to their respective branches of the service."

The federal statute, 45 U. S. C. A., Sec. 62, provides "that no operator, train dispatcher, or other employee who by the use of the telegraph or telephone dispatches, reports, transmits, receives, or delivers orders pertaining to or affecting train movements shall be required or permitted to be or remain on duty for a longer period than nine hours in any twenty-four-hour period in all towers, offices, places, and stations continuously operated night and day. . . . "

Plaintiff testified that his employment with the railroad was not steady; that he was assigned to the job where injured on October 28, 1940 (he was injured November 19, 1940); that a short time prior he had talked with E. H. Campbell, the terminal train master, and told Campbell that he (plaintiff) "had to have more work to make more money"; that he had an offer of a better job, and asked for a leave of absence; that Campbell said that "he couldn't give me a leave of absence and he suggested that I hold both of them (jobs) for a while to see whether or not the railroad business was going to pick up and the work would be steady."

Defendant says that plaintiff's outside employment was not brought to the attention of any one who had authority to waive the rules. Campbell admitted that plaintiff talked to him and asked for a leave of absence, but denied that he told plaintiff it would be all right to take the outside work, and Campbell said that he had no authority to waive the rules, and that he would not have permitted plaintiff "to hold a job outside of the railroad company had I been aware of that." The clear implication is that Campbell had authority to prevent plaintiff from doing outside work, and according to plaintiff, Campbell knew that he was doing the outside work. The jury found for plaintiff and we take as true plaintiff's evidence. Hence, for the purposes of the demurrer, Campbell knew that plaintiff was doing the outside work and did nothing about it. In the situation, we rule the assignment against defendant.

Plaintiff was injured about 6:45 A. M., while it was yet dark. A westbound train, consisting of some 25 or 30 cars, had pulled up from the east and had stopped. It was plaintiff's duty to set the necessary switches for this train to move west through the yards and to the stock yards on to the west. For this movement it was necessary to set two switches. Plaintiff first set the east switch and then walked west (distance not shown) on the north side of the track on which the westbound train would move and set the west switch, and signaled the westbound train to come on. About the time, or shortly thereafter, that plaintiff set the west switch, a train, consisting of engine, 3 cars and caboose, moved up from the west on the track next north of the track on which the westbound train would move, and this eastbound train stopped with a part of the engine east of the west switch. The clearance between the two tracks at some point, not clear, between the east and west switches, was only 6 feet and 5 inches, and as we understand, the clearance diminished as the tracks approached the east switch, and increased as they approached the west switch. The overhang was 2½ feet on each train, hence the clearance between the cars, moving in opposite directions, at some point or points between the two switches was only about 17 inches.

When plaintiff had set the west switch and had signaled the westbound train to come on, he walked east on the south side of the engine headed east (then standing), intending to line the east switch when the westbound train had cleared that switch. The yards telephone was in the switch shanty, between the two switches mentioned and immediately north of the track on which was the eastbound train. While walking east with the eastbound train standing and the westbound train approaching, the telephone in the switch shanty rang and plaintiff decided to go on east, pass in front of the engine headed east and answer the telephone, which it was his duty to do. Just after the telephone rang, the eastbound train, without ringing the bell, started up, and plaintiff soon realized that he could not make it around the front of the engine, and turned back west, but was struck and injured at some point (not given) east of the west switch. Plaintiff was the only witness who testified as to what occurred, and he testified:

"Q. After you got over there and performed this operation (set the west switch) did you know the other train (eastbound) was coming up there? A. Yes, I saw it then. Q. Did it stop or go on? A. It stopped momentarily. . . . Q. Now, after that train came in there and stopped, what did you attempt to do? A. He stopped momentarily and I was on the way back (east) from lining the (west) switch to the drag that was going (west) into the stock yards there. Q. Why did you have to go back there? A. My duties were to get back on the job there (reline east switch). Q. Now, as you moved (east) along there, did anything attract your attention? A.

Just after he (engineer of eastbound train) stopped and was standing momentarily still, the phone rang and I started to go answer the phone. Q. Was that your duty to do that? A. Absolutely. . . . Q. How far did you get up alongside of this engine that was standing there before it moved? A. I moved up pretty close to the engineer, maybe east of him. Q. Did the train then start? A. The train started rather slowly, yes, sir. . . . Q. Did the engineer ring the bell at all before starting this engine into motion? A. No, sir. . . .

"Q. When he started up under those circumstances, how near had you gotten to the front of the engine? A. I was past the engineer—at least to the engineer—I don't know exactly. Q. When they start slowly, state whether or not the trainmen do, in performing their duties, frequently cross in front of engines? A. Men do cross in front of engines. Q. What did you attempt to do after you found the engine in motion? A. I attempted to get past the engine to answer the telephone and as I started towards the telephone the engineer gave it (the engine) the gun. Q. What do you mean? A. Pulled the throttle open, gave it the steam; that is just a railroad expression; it is to get more speed. Q. And after he gave it the gun and started on, what did you attempt to do? A. I saw the trap and how close the cars were and I turned and attempted to get back where it was wider. Q. What happened? A. Something struck me and kept hitting me and it carried me down (west) to 24 (west) switch, and when I got there I grabbed the switch and pulled my legs in to keep them from getting cut off. . . .

"Q. If the engineer had rung the bell before starting the engine, was there any obstruction or anything to keep you from going back or hurrying around the front of the engine? A. There was not, no, sir. Q. When he gave her the gun, as you have termed it, what speed would you say he moved up to? A. He started slowly, I judge 10 or 15 miles per hour; he increased that at the time I was struck."

Cross examination: "Q. And when this engine on track 24 (eastbound) started to move, as I understand you, you stopped, or did you walk on farther? A. I stopped momentarily to see what was going on and the phone rang and I started to go east. Q. You stopped momentarily? A. Yes, sir. Q. And you heard this phone ring and you started to walk east? A. Yes, I thought I could get around it and answer the phone. Q. You thought you would walk around the front of the engine? A. Yes, sir. Q. And that was after this train on 24 had started moving? A. Yes, sir. Q. And you walked along there for a considerable distance before he gave her the gun? A. I walked along, first he was going slowly and I thought I could walk around the front of the engine. Q. How far did you walk with the engine? A. A few feet, I guess, ten or fifteen. Q. From the time the engine started you walked (east) down towards the switch stand? A. Yes, sir. Q. And that was with the idea of going

around the engine? A. I though he was going slowly enough that I could go around the front end and answer the phone.''

Redirect examination: ''Q. Now, counsel asked you about this train moving and you moving up here and then this train starting up and the engineer giving her the gun, if he hadn't given ▮ her the gun could you have gotten around safely? A. Yes, if the train had moved slowly I could have gotten around safely, it might have been pretty close, but I believe I could have gone through. Q. If he hadn't given her the gun you could have gotten through there? A. Yes, sir.''

▮ Under the Federal Employers Liability Act, 45 U. S. C. A., Sec. 53, contributory negligence on the part of the employee does not bar recovery, ''but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee.'' However, a plaintiff suing under the Act is ''bound to prove negligence on the part of the defendant or its servants and that such negligence contributed to cause the injury'' complained of. Seaboard Airline Ry. Co. v. Horton, 233 U. S. 492, 34 S. Ct. 635, 58 L. Ed. 1062. Or, as quite recently (Jan. 17, 1944) stated, one suing under the Act is ''required to present probative facts from which negligence and the causal relation could reasonably be inferred.'' Tennant, Admx. v. Peoria & Pekin Union Ry. Co., 64 S. Ct. 409.

▮ It is manifest that plaintiff walked east a short distance after the eastbound train started, but it is equally manifest that had the bell been rung before the engine started, plaintiff would not have been as far east as he was when he first knew the eastbound train would start, and had the engine bell rung before the engine started, plaintiff would have been proportionately farther from the telephone when it rang, and might not have decided to answer the phone. We think that the evidence is such that a jury could reasonably infer that plaintiff walked east to a point where the clearance was not sufficient for safety in reliance upon compliance with the rule to ring the bell before starting up the engine, and we think that a jury could reasonably infer from the evidence that had the bell been rung, as required by the rule, plaintiff could have escaped injury. The questions on plaintiff's contributory negligence and proximate cause were, we think, for the jury. Goslin v. Kurn et al., 351 Mo. 395, 173 S. W. (2d) 79, l. c. 84, and cases there cited; Mech v. Terminal R. Assn., 322 Mo. 937, 18 S. W. (2d) 510; Moran v. Atchison, T. & S. F. Ry. Co., 330 Mo. 278, 48 S. W. (2d) 881; Rowe v. M. K. & T. R. Co., 339 Mo. 1145, 100 S. W. (2d) 480.

Failure to ring the bell and the alleged insufficient clearance were submitted in the conjunctive, hence, in ruling the demurrer to the evidence, it will not be necessary to determine the sufficiency of the evidence on the alleged insufficient clearance. Guthrie v. City of St. Charles, 347 Mo. 1175, 152 S. W. (2d) 91, l. c. 98; Scott v. Mo.

Pacific R. Co., 333 Mo. 374, 62 S. W. (2d) 834, l. c. 838; Orr v. Shell Oil Co., 352 Mo. 288, 177 S. W. (2d) 608; Monsour v. Excelsior Tobacco Co. (Mo. App.), 115 S. W. (2d) 219, l. c. 324; Whitehead v. Fogelman (Mo. App.), 44 S. W. (2d) 261, l. c. 263.

Several complaints are made on plaintiff's instruction No. 1, and complaint is made on the refusal of defendant's instructions C, D, and E. All the complaints, except one, on instruction No. 1 were, in effect, disposed of in ruling the demurrer to the evidence. Instruction No. 1 referred to rule 30 "mentioned in the evidence." Defendant says rule 30 was not introduced. Plaintiff was asked about the rule and among other things, had said that it was in full force and effect when he was injured. Counsel for defendant objected on the ground that the rule book was the best evidence. Plaintiff's counsel then read the rule, as follows: "Except where the momentary stop and start, forward or backward, are a continuous switching movement, the engine bell must be rung when an engine is about to move", and then the record shows: "Q. Was that rule in force at that time? A. No, sir, the bell wasn't rung (the answer was not responsive, but no attention was given to that). Q. Did the engineer ring the bell at all before starting this engine into motion? A. Mr. Chastain: We object to that for under this rule and under plaintiff's own testimony it wasn't a situation where the bell would be required to be rung. The Court: Overruled." While rule 30 was not formally introduced, it was read in the presence of the court and jury, and from the above objection, it would appear that counsel for defendant regarded the rule as in evidence. Defendant's refused instructions C, D, and E were withdrawal instructions, and are disposed of in ruling the demurrer to the evidence.

Error is assigned on overruling defendant's objection to plaintiff's evidence as to his conversation with the chief yard clerk and Mr. Campbell about plaintiff's outside work. The objection was based on the ground that there was no showing that what the clerk or Campbell said on the subject would be binding on the defendant, that is, that there was no showing that they had authority to waive compliance with rules 700 and 703. Defendant cites Oatman v. St. Louis-S. W. Ry. Co., 304 Mo. 38, 263 S. W. 139; Stuart v. Dickinson et al., 290 Mo. 516, 235 S. W. 446; 35 Am. Jur., p. 704, Sec. 282.

On cross examination Campbell testified: "Q. You said a while ago that if you had known this man was doing outside work you wouldn't have permitted him to work for the company? A. I would have given him an investigation for violation of the rules for being employed two places. Q. You were his superior? A. Yes, sir. Q. And he was obliged to do what you told him in those operations there in the yards? A. He was obliged to answer my questions as to an investigation. Q. If you have instructions he was to obey them? A. I was supposed to operate those yards."

As we see it, no question of the authority to waive a rule is involved. Plaintiff's outside work was contrary to the rules. He says the chief yard clerk and Campbell knew about it, and that Campbell approved. Such is plaintiff's excuse for violating the rules, and we think that the conversations complained of were competent, not on the ground that the chief yard clerk and Campbell had authority to waive the rules, but competent in support of plaintiff's excuse for violating the rules. It is a basic rule of evidence that "evidence of whatever facts are logically relevant to the issue is legally admissible except as it may be excluded by some specific rule or principle of law." 31 C. J. S., p. 864, Sec. 158.

On refusal to discharge the jury: In answering a question, plaintiff volunteered that his injuries had affected him sexually. Such was stricken on motion that such damage was not pleaded. The trial went on for some time, not over 30 minutes, defendant says, and then defendant moved to discharge the jury because of the voluntary statement. The court overruled the request and defendant saved exception. There is nothing in the record to suggest that the attention of able counsel was *diverted* at the time the court sustained the motion to strike, and if the matter did not then sufficiently impress counsel to prompt a request to discharge, it is reasonable to conclude that the jury was not likely to have been affected. We do not think that the matter is of sufficient importance to justify reversal. Secs. 973, 1228, R. S. 1939, Mo. R. S. A., idem. Counsel sought to show by plaintiff's wife that because of a recent operation she might not be able to remain in court till the trial ended. Objection was sustained, and defendant asked that the jury be discharged. The court did not rule on the request to discharge, and defendant saved no exception to the court's failure to rule, hence there is no point to rule. Gann v. Chicago, R. I. & P. Ry. Co. et al., 319 Mo. 214, 6 S. W. (2d) 39, 1. c. 46, and cases there cited.

Is the verdict excessive? Plaintiff was 36 years old at the time of injury and in good health. He was struck in the lower lumbar region; taken to the Missouri Pacific Hospital; X-rayed under the supervision of Dr. J. E. Castels, district surgeon for the hospital; taped around the back. Plaintiff said that he was suffering intense pain in the right side, lower back and spine. He remained in the hospital for about three weeks, and returned home where he was treated by Dr. Edward Garrity, his family doctor, who gave "heat treatments and medicine internally."

Plaintiff went back to work (gun finishing work) for the A. J. Stevens Company in December, 1940 (day not given), but said that he wasn't actually working; was "sort of supervising"; and that he tired so he had to "lie down and rest two or three times a day"; that he "had a little office and chair and desk. Each day we got the orders and the men would come to my desk and I would outline the

work to be done"; that he worked for the A. J. Stevens Company until September, 1941, when he went to work (finishing with a spray gun) for the ABC Cabinet Shop; that the work was carried to him; that another did all the lifting; that he worked for the Cabinet Shop until January, 1942, and then was NYA Supervisor, teaching wood finishing; that the NYA work was discontinued by the government about July 20, 1942, and that he then worked for the Colonial Fixture Company, and was with this company at the time of the trial, July 19, 1943.

. Plaintiff testified that he had pain constantly; that in the morning the pain was not great, "but as the day goes on it grows more intense"; that the brace, prescribed by Dr. Garrity, "seems to brace the muscles and my sprained back on the right side, but it doesn't give me relief in the back"; that he couldn't do any kind of work without the brace; that he had been doing railroad work since he was 15, but that he could not, in his condition, "do lifting and normal labor"; that if he stoops and starts "to lift anything the pain is so great I just can't lift"; that his "body is very weak and very nervous and I am just generally upset."

Plaintiff's wife testified that it was difficult for him to get around without the brace; that he wears the brace all the time; that plaintiff's nerves have been affected; that he is exhausted "with just a few hours being up"; that he can do nothing around the house; "his skin is like it was in the hospital, ashen without color and he is drained of energy"; that sleep is often difficult; that since the injury he has to get up two or three times at night, and that prior to injury, he had no "trouble with his kidneys or urinary organs."

Dr. Clyde Donaldson, plaintiff's witness, testified that he made X-ray of plaintiff's back and pelvis December 18, 1940, and that the X-ray showed that the first, second, third, and fourth transverse processes of the lumbar vertebra were broken off; that such "would necessarily injure the nerves and tendons up and down his back", and "I think he has a permanent disability."

Dr. Edward Garrity, plaintiff's family doctor, testified that he first examined plaintiff about December 16 or 17, 1940; that he then "had a marked muscle spasm in the back in the lumbar region and he has a disturbance in his reflexes. . . . The condition of his back was painful to manipulation and my examination all indicated the trouble was in the lumbar region of the back. A day or so later, Dr. Donaldson, at my suggestion, took the X-ray plates . . . The treatment is palliative in one sense. I mean by that that surgery would do the man no good. · . . . Q. If this man, over a period of two years since this accident occurred, has continued to have excessive weakness of body and the lower limbs and becomes numb at times and his legs feel like they have gone to sleep after he sits for a little while and he has an exhausted feeling all over the body from

just a little exercise and his body has a tendency to sag down, as you have described, what, in your judgment and opinion, do you attribute this condition to? A. I attribute this condition to this injury and I think after this time the recovery will be very slow. Q. After it has remained two years, what do you say about the permanency of the injury? A. I think it will stay just about the way it is.''

Dr. Castels and Dr. Ira H. Lockwood examined plaintiff shortly before the trial, and were witnesses for defendant. According to their evidence, plaintiff's injuries are not so serious as indicated by plaintiff's case. Dr. Castels, who saw plaintiff immediately after he was injured, said that the X-ray study at that time showed that plaintiff had a fracture of the transverse processes of the first, second, third and fourth lumbar vertebra on the right side. It will not be necessary to set out the evidence of Drs. Castels and Lockwood.

The character of plaintiff's injuries are such as to make applicable what was said in Hoelzel v. Chicago, R. I. & P. Ry. Co., 337 Mo. 61, 85 S. W. (2d) 126, 1. c. 133. We are not persuaded that the verdict is excessive. See Feltz v. Terminal R. Assn., 336 Mo. 790, 81 S. W. (2d) 616, 1. c. 620; Carpenter v. Wabash Ry. Co., 335 Mo. 130, 71 S. W. (2d) 1071, 1. c. 1075; Zichler v. St. Louis Public Service Co., 332 Mo. 902, 59 S. W. (2d) 654, 1. c. 659; Rockenstein v. Rogers, 326 Mo. 468, 31 S. W. (2d) 792, 1. c. 802. The judgment should be affirmed, and it is so ordered. *Dalton* and *Van Osdol, CC.*, concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur.