CLAUDE DENVER HOWERTON, (Plaintiff) Respondent, v. RAILWAY EXPRESS AGENCY, INCORPORATED, (Defendant) Appellant, No. 41914—235 S. W. (2d) 250.

Division Two, January 8, 1951.

*Watts & Gentry* for appellant.

*Everett Hullverson* for respondent; *Forrest Boecker* of counsel.

[251] ELLISON, P. J.—The defendant Express Agency appeals from a judgment against it and a co-defendant, the Terminal Railroad Association of St. Louis, for personal injuries sustained by the plaintiff-respondent through being struck by one of Terminal's empty baggage trucks at Union Station in St. Louis. The verdict originally was for plaintiff-respondent in the sum of $14,000. The Terminal did not file a motion for new trial and hence is out of the case.

The defendant Express Agency did file a motion for new trial, charging error in the instructions and the admission and exclusion of evidence, and that the verdict was excessive. The trial court ordered a remittitur of $4,000, and entered judgment for $10,000 with interest and costs. On this appeal the Express Agency contends the verdict is still excessive by $5,000. That is the only point presented, although appellant raised other points below. We have appellate jurisdiction because the amount in dispute, exclusive of interest and costs, exceeded $7500 when the case left the trial court. Lange v. St. Louis Public Service Co., 361 Mo. 74, 233 SW. (2d) 641; Art. V, Sec. 2, Const. Mo. 1945.

The evidence most favorable to plaintiff-respondent was as follows. He and two other employees were loading a corpse from a baggage truck on the station platform into the baggage car of a train that was due to leave in about 10 minutes. The truck was standing parallel to the baggage car and opposite its side door. In order to get the coffin box, weighing 350 or 400 pounds, through the car door it was necessary to turn it at right angles across the truck and station plat-

form. An empty baggage truck was standing on the platform at a place where it would interfere with this loading movement. Respondent pushed that truck laterally along the platform out of the way.

Another Express Agency employee, Gregory, approached on the platform driving a baggage tractor. The empty truck as thus placed by respondent interfered with Gregory's passage, and he got off the tractor and shoved the empty truck out of the way, but into a position where it again interfered with the loading of the corpse. Respondent was returning to the baggage car with his back turned from Gregory and didn't know this had been done. On discovering it he turned back and moved the empty truck out of the way again. As he returned to the baggage car the second time he was hit in the back by the front end of the empty truck, thus causing his injury. Two other employees, Mitchell and Scowden, engaged in loading the corpse testified that on this second occasion Gregory used his tractor in "hitting" the empty truck, and that there was a crash when the tractor struck it. Gregory denied this, and said he was on foot when he moved it.

There was one variance between the testimony of respondent and the three other witnesses. They said respondent knew Gregory had pushed the truck back the first time. An altercation followed the second episode in which foul language was used and blows were exchanged by Gregory and Mitchell, but not by respondent. Scowden said respondent was knocked down.

The casualty occurred on February 14, 1949. He was 44 years old. His back hurt him quite a bit. He went to the Terminal office and made a report, and was taken to a hospital in an automobile by a fellow employee. In using the Terminal office elevator he had to reach down to pull a chain, and he couldn't get back up. At the hospital they took X-rays the next morning [252] and taped his back from his shoulder blades to his waist. It stayed there a week. He remained in bed at the hospital for three days. Then he went home and remained in bed for three or four weeks with a board under the mattress. After the first week he went back to the hospital and the tape was removed.

He received no other treatment except heat and bending exercises. The latter hurt him and so does lifting objects, though he can do it. Also his right hip hurts. His wife rubs liniment on his back and he takes a hot bath every night and still uses a board under his mattress. He tried to put coal in the basement and carry out ashes, but it was too painful. He thought he could do office work, but doesn't know how. His earnings on the Terminal job were $11.47 per day, six days a week. This would amount to $68.82 per week, or $3578.64 per year, full time. His medical bill was $50.00. This was respond-

ent's testimony at the trial on November 7, 8, 1949, about nine months after the casualty.

The record here shows four hospital records were introduced in evidence, Exhibits 6 to 9, and five X-ray pictures, Exhibits 10 to 14. The first two hospital records show the respondent when admitted was in much pain from a blow to the right side of the pelvis, and continued to be the next day. The third record, dated the third day, February 16, stated he had a fracture of the *3rd* and *4th* lumbar vertebrae in the right transverse processes thereof. The fourth record, dated February 26, stated X-ray pictures of the 2nd and *3rd* lumbar vertebrae showed an irregular transverse fracture of the right process of the 1st lumbar vertebra with fragments in good position, and a slight irregularity of bone texture of the right transverse process of the 2nd lumbar vertebra, but no fracture line was seen. There is no claim in this case of damage to the 3rd and 4th vertebrae.

Dr. Levey, a specialist in X-ray work, testified the spine and pelvis were X-rayed from front to back and from one side to the other on May 20 (this was Exhibit 14) and showed fractures of transverse processes on the right side of the 1st and 2nd lumbar vertebrae, the latter being deformed, but the fracture hidden by the angle of the camera. They were not completely healed, but the position of the fragments was good. There was also some slight or minimal degree of osteoarthritis of the spine, which signified a bony deposit on the vertebrae. It comes with age without any trauma, though the latter may aggravate it. Anybody can have it, and it may be caused by rheumatism or a number of diseases. Dr. Levey went through the several X-ray pictures, and said the later ones showed some healing. In fact the last one, taken on September 20 (Exhibit 10) showed some arthritic change in the 3rd lumbar vertebra (which was not hurt) on the *left* side of the body. In this picture the fracture line of the first lumbar vertebra was no longer visible.

Dr. Pernoud, a surgeon, testified the respondent had consulted him at his office 9 or 10 times, the first on May 18, and the last on October 11. He attributed the respondent's frequent visits to a desire for the "personal touch" in treatment, as against the impersonal treatment received at a hospital. The patient had a marked tenderness over the upper lumbar vertebrae region at the waist line. He explained the transverse processes on the right and left side of a vertebra, are bony projections to which the large loin muscles and ligaments in that region are attached, in which muscles they are deeply buried. When the vertebrae are injured the muscles contract to protect them. He said there was complete break of the transverse processes of the 1st and 2nd lumbar vertebrae, but that they were in good position.

To break them requires considerable force, which bruises the surrounding muscles, nerves and other tissue, and the edges of the joints

and vertebrae. This causes pain and tension, as he found in this case. The patient also had a minimum amount of hypertrophic arthritis, which the doctor defined as "common rheumatism," but stated it ordinarily does not cause pain. However, he said the blow from the truck might produce pain non-existent before. Then he [253] expressed the view that respondent would have some permanent deformity of the fractured vertebrae, but believed he had shown and would show improvement as time goes on. However, he said respondent would have a sensitive back all his life, and that exercise or work and changes of weather would produce pain and discomfort.

Dr. Olney A. Ambrose was used as a witness by the defendant-appellant, but it appears he had been approved as a qualified expert by counsel for plaintiff-respondent. He specialized in X-ray diagnosis. He examined respondent on October 7, a little less than 8 months after the injury and a month before the trial. Respondent complained of pain and stiffness in the lower back and right hip. The doctor first made a complete physical examination. The spine described its normal curves, but in bending his body forward and backward there was some mild muscle tension in the lower lumbar spine, but it didn't go into spasm; nor was there any wasting of the muscles, or pressure on the nerves emerging from the spine. The X-ray pictures taken by this witness indicated there had been a fracture of the right transverse process of the first lumbar vertebra, but with perfect position and union. The witness expressed the opinion that respondent was able to work without interference, though he might have some discomfort in bending acutely. However, he agreed heavy manual labor requires a strong back. He didn't recall any affection of the right sacroiliac joint. So much for the evidence. Appellant cites the decisions listed below.[1] On the other hand plaintiff cites five late cases

[1]Williams v. Ill. Cent. Rd. Co., Apr. 10, 1950, 360 Mo. 501, 229 SW. (2d) 1, 6 (8, 9). Office worker, age 19, no fractures. Verdict for $9000 reduced to $7000.

Hamilton v. Patton Creamery Co., July 11, 1949, 359 Mo. 526, 537-9(6), 222 SW. (2d) 713, 718-19 (10-12). Motorcycle policeman, age 33. Resumed work. Verdict for $10,000 reduced to $6998.

McGarvey v. St. Louis, Feb. 14, 1949, 358 Mo. 940, 949(4), 218 SW. (2d) 542, 547-9(6-8). Sewing machine operator, age 36. 4th and 5th lumbar vertebrae and sacroiliac affected. Verdict for $10,000 reduced to $7500.

Arno v. St. L. Pub. Serv. Co., June 9, 1947, 356 Mo. 584, 588-9 (6), 202 SW. (2d) 787, 789-90(7). Age and occupation not shown. Vertebrae fused. Verdict for $10,000 reduced to $7000.

Weisman v. Arrow Trucking Co., (Mo. App.) Dec. 7, 1943, 176 SW. (2d) 37, 44-5(14-17). Scrap iron dealer, age 50. Complete fracture of 2nd, 3rd and 4th lumbar vertebrae transverse processes. Verdict for $7500 reduced to $6000.

Donley v. Hamm (Mo. Div. 1) Nov. 12, 1936, 98 SW. (2d) 966, 969(4). Egg route dealer, age 33. 6th, 7th and 8th cervical vertebrae affected. Verdict for $10,000 reduced to $8000.

involving injuries to vertebrae, back or pelvis.[2]

[254] Ever since the decision of Cook v. Globe Printing Co., 227 Mo. 471, 547(17), 127 SW. 332, 354(21) this court has held to the doctrine that where a verdict is too large, but not to the extent of indicating the jury was actuated by passion and prejudice, and where there was no trial error otherwise, the appellate court may enter a remittitur of a part of the verdict if the plaintiff consents. In that case the verdict was for $150,000—$75,000 actual and $75,000 punitive damages, and this court reduced it $100,000, to $50,000.

In this case there possibly may have been some indication that the jury was actuated by passion in view of the aggressive and abusive conduct of the tractor driver Gregory. The verdict returned was for $14,000. But the trial court reduced it to $10,000, and the defendant-appellant now contends only that a $10,000 judgment would be excessive by $5000 from a compensatory viewpoint.

That is the only issue on this appeal. But what standards do we have to guide us in determining the question? It was said in the Arno case, supra,[1] 356 Mo. l. c. 589, 202 SW. (2d) l. c. 790, that "Previous cases decided are of little value as a guide post for other cases." And that is true where the facts are substantially different. But when they are legitimately comparable we have in many cases cited and relied on former decisions.

---

[2]Rinderknecht v. Thompson, Trustee, Apr. 11, 1941, 359 Mo. 21, 34(10), 220 SW. (2d) 69, 75(15). Milk truck driver average annual earnings $2782 full time. X-ray showed no fracture or dislocation of any vertebrae, but there was tenderness of both sacroiliacs, but plaintiff was unable to do heavy manual labor partly because of a congenital lesion. Verdict for $20,000 reduced to $15,000.

Van Campen v. St. L.-S. F. Ry. Co., Dec. 13, 1948, 358 Mo. 655, 663(5), 216 SW. (2d) 443, 449(9, 10). Female office manager, age 36. Fracture of lower vertebra of spine and upper pelvis, and disk in between. Good alignment and patient would be able to engage in useful occupations. Earnings $3000 per year. Verdict for $25,000 reduced to $15,000. One judge held reduction should be to $20,000.

Marczuk v. St. L. Pub. Serv. Co., Oct. 14, 1946, 355 Mo. 536, 549(6), 196 SW. (2d) 1000, 1007(6-8). Heel cutter shoe factory, age 48. Average annual earnings $3900 full time. Fracture of 8 ribs and shoulder blade. Healed in poor position. Verdict for $18,000 upheld, diminution of earnings and economic conditions considered.

DeMoulin v. Roetheli, Sept. 4, 1945, 354 Mo. 425, 437(10), 189 SW. (2d) 562, 567(13-16). Packing house employee delivering heavy sides of meat. Earnings over $3000 per year. Slipped on grocery store floor. Injury to spine in lumbro-sacral region and to nerve structure of back. Left leg drags. Must wear brace permanently, and can do only light work. Verdict for $16,130 affirmed.

Godsy v. Thompson, Trustee, Mch. 6, 1944, 352 Mo. 681, 691-2(7), 179 SW. (2d) 44, 49(10). Switch tender, age 36. 1st, 2nd, 3rd and 4th transverse processes lumbar vertebrae completely broken. Wore brace. Afterward worked as gun finisher. Verdict $10,000 upheld.

It is definitely established by our decisions that economic conditions, or the purchasing power of the dollar, will be considered in evaluating the reasonableness of the verdict, as held in the Hamilton case, supra, 359 Mo. l. c. 538, 222 SW. (2d) l. c. 719, and the McGarvey case, 358 Mo. l. c. 950, 218 SW. (2d) l. c. 547. The dollar is a fixed unit of our currency but it is after all only a measure of value of decreased earning power, physical impairment, pain and suffering and the like, and that value fluctuates as its purchasing power increases or decreases. The ability of the plaintiff-respondent to perform his former heavy manual labor has been impaired, he has been at expense, and he will suffer pain at that work. He is not trained to do lighter work of equal earning value—such as office, sales, administrative or technical work. How long it would take to obtain and qualify for such a job is speculative.

His wages were over $3500 per year, and at the time of trial he had not worked for almost ten months. There was no evidence as to his hospital, X-ray and medical expenses, except that Dr. Pernoud's bill was $50. The doctor said the deformity in the fractured vertebrae was permanent, but that plaintiff had improved and would continue to improve as time went on. But he added that plaintiff will have a sensitive back all his life, and that exercise or work and changes of weather will produce pain and discomfort.

Dr. Ambrose examined plaintiff on October 7, the first day of the trial. He said when plaintiff's body went back and forward there was still some tension in the lower lumbar spine. Plaintiff complained of discomfort in the right hip joint when it was flexed, but there was no muscle wasting or nerve pressure. The doctor thought plaintiff was able to work. But he conceded a man hauling baggage needs a good strong back and is handicapped.

The trial court saw and heard the witnesses, including the plaintiff-respondent. He was in a better position to rule on the question of damages than we are here. For us to remit one to several thousand dollars from the present verdict would be a matter of guess work. In the opinion of the writer $5000 as requested by appellant, would be entirely unreasonable. Accordingly it is ordered that the judgment be affirmed. All concur.