250 S.W.2d 999 (1952)
BAKER
v.
KANSAS CITY TERMINAL RY. CO.
No. 42794.
Supreme Court of Missouri, Division No. 1.
September 8, 1952.
*1000 Lathrop, Woodson, Righter, Blackwell & Parker, Winston H. Woodson, James F. Walsh, Robert D. Youle, Kansas City, for appellant.
Paul C. Sprinkle, William F. Knowles, Roy F. Carter, Sprinkle, Knowles & Carter and F. M. Kennard, Kansas City, for respondent.
COIL, Commissioner.
Judgment for $10,000 was entered on a jury's verdict in plaintiff-respondent's action for damages for personal injuries alleged to be the result of defendant-appellant's negligence. Defendant contends that: the court erred in overruling its motion for directed verdict and in giving instruction A; the verdict is grossly excessive.
Plaintiff was an employee of Railway Express Agency, Inc. (referred to hereinafter as Express Co.). Express Co., a tenant of a portion of Union Station in Kansas City, owned and operated by defendant, was granted the right to use, in common with others, defendant's platforms between the various railroad tracks for the purpose of loading express into train cars. It was necessary to pull express trucks or wagons from various places to the doors of cars. Platform 5 ran east and west adjacent to tracks 19 on the south and 20 on the north. Prior to 1947, this platform was constructed of 2" x 10" wood planks about 21½' in length, laid crosswise, i. e., from north to south. During 1947 defendant employed an independent contractor to convert the platform to concrete. A portion was converted in 1947. On April 3, 1948, the same contractor began to convert the remainder, beginning at the east. On April 23, in accordance with usual procedure, the 2" x 10" planks were removed from a 32' long (east to west) section of platform 5. (Consequently, to the east of the removed section was a new concrete platform and to the west was the old wood platform). Some of the removed planks were placed lengthwise (east and west) over one half of the removed section. It was necessary to place two planks end to end to cover the 32' length. The east ends of these planks were flush with the concrete platform and the west ends overlapped about 11' onto the old wood platform. Thus, there was a "temporary bridge" 43' in length covering one half the total width of the removed section (about 10'), flush with the concrete on the east and overlapping about 11' on the wood platform on the west, and the west end 2" higher than the surface of the old wood platform. A barricade about 3' high was placed along the south edge of this temporary bridge and extended around the east and west ends of the removed section. At the west end of the temporary bridge was placed a 2" x 6" board extending across the ends of the overlapping planks. This board (sometimes called *1001 cross board) was supposed to be beveled so that the 2" rise from the old wood platform to the temporary bridge would be gradual.
Plaintiff was a working foreman or lead man and on April 25, 1948, had a crew of three. He had been instructed by his foreman to load express into a car standing east of the temporary bridge on track 19. About 11:30 p. m., plaintiff walked from east to west over the temporary bridge to get one of three express wagons which were then standing on the south side of the old wood platform at a place west of the west barricade. There were other wagons or trucks standing in the area. The express wagons or hand trucks (hereinafter referred to as wagons), made largely of wood, were about 8' long, 30" to 40" wide, with a flat bed about 36" above the floor. Each had four 18" wheels made either of steel or hard rubber, and a tongue about 30" or 40" in length with an iron loop in the end used as a handle for pulling. The wagon in question was equipped with a fifth wheel which permitted the front wheels and the tongue to be turned to the right or left in a complete circle.
Plaintiff obtained the wagon, weighing as loaded from 1,000 to 1,800 lbs., and by an irregular course proceeded to pull it (facing the wagon and walking backwards) against the cross board of the temporary bridge. The right front wheel struck before the left, and the tongue jerked and threw plaintiff to the south against the barricade.
Plaintiff examined the cross board and determined that it was beveled about one third on the upper side, that is, although beveled there was still a blunt side of the board 1 1/3" high, against which the wheels of the truck would necessarily strike.
The bridge was completed on Friday before the accident on Sunday. Plaintiff knew the temporary bridge was there but had never pulled an express wagon over it; had not observed the exact manner of its construction; had had no experience which would suggest to him that pulling the truck so that one front wheel which struck the cross board before the other would cause the tongue to jerk sufficiently to cause him to be thrown into the barricade; had pulled wagons before but not under the conditions which obtained. It was necessary to gain some momentum in order to negotiate the bridge when one man was pulling a loaded express wagon. The bridge was so constructed that if the wheels of a wagon hit the bridge at a "very slight angle" the tongue would be thrown in the opposite direction.
Defendant's employee had planned the construction of the temporary bridge and had specifically instructed the independent contractor not to cut the 21½' planks. This, in order to conserve them because "they cost money". By cutting the 21½' planks to proper lengths, the west end of the temporary bridge would have been flush with the east end of the old wood platform, and there would have been no overlap or consequent difference in elevation between the old wood platform and the temporary bridge. The 2" × 6" cross board was supposed to be beveled (according to plan) its full width so that the bevel would extend for ¼" at its west side to the full thickness of the board at the east. Other evidence will be referred to later in the opinion.
The cause was submitted on the single question of whether defendant constructed the temporary bridge with an insufficiently beveled board as the approach to the west end thereof and whether, if so, such construction was a failure to use ordinary care to make the platform reasonably safe for plaintiff's use. Defendant contends that there was no evidence of negligence in its construction or maintenance of the temporary bridge.
Plaintiff's employer, Express Co., was a tenant of defendant with the right to use platform 5 in common with others. Plaintiff, employee, was in the same relation to defendant as his employer. Darlington v. Railway Exchange Bldg., 353 Mo. 569, 578[1], 183 S.W.2d 101, 105[1, 2]. Defendant had the duty to plaintiff to exercise ordinary care to maintain platform 5 in a reasonably safe condition for the use intended, or a duty not to create a condition which would make the platform unsafe or dangerous for its intended use. Schneider v. Dubinsky Realty Co., 344 Mo. 654, *1002 664[6], 127 S.W.2d 691, 696[15]; 52 C.J.S., Landlord and Tenant, § 417, page 27, "Use contemplated"; Rest.Torts, Vol. 2, § 360, p. 976.
The temporary bridge was constructed exactly as directed by defendant. Thus, there is no question in the case concerning the liability of defendant by reason of the performance of the work by an independent contractor. Defendant knew the exact manner in which the temporary bridge was constructed and knew that plaintiff and others had to use platform 5 to transport express from places west to places east of the bridge by pulling heavily loaded express wagons upon and over the temporary bridge. There was evidence from which a jury could reasonably find: that the cross board at the west ends of the planks of the temporary bridge was supposed to be so beveled that there would be only a ¼" rise from the surface of the old wood platform to the beginning of the beveled portion of the cross board; that there was in fact a 1-1/3" rise from the surface of the old wood platform to the beginning of the beveled portion of the cross board; that such cross board was not beveled sufficiently to make the approach to the bridge gradual enough to prevent the tongue of an express wagon from jerking sufficiently to throw one pulling it to the side when one of the front wheels struck the cross board before the other; that it was standard, common practice in constructing temporary bridges, such as the one here in use, to make the ends thereof flush with adjacent surfaces wherever possible; that such "flush" construction of the west end was possible and practicable here but was not employed for the sole reason that defendant directed the contractor not to cut the planks.
This evidence was sufficient to make a jury issue as to whether the failure of defendant to sufficiently bevel the cross board made the use of the platform unsafe for the purpose intended and constituted a failure on the part of defendant to exercise ordinary care to keep platform 5 in a reasonably safe condition for use by plaintiff. Schonlau v. Terminal R. Ass'n of St. Louis, 357 Mo. 1108, 1113[1], 212 S.W.2d 420, 422 [1, 2].
Defendant offered evidence to the effect that construction of the instant temporary bridge was in accord with standard, common practice in like construction projects in Kansas City and contends that where construction conforms to usual and ordinary practice, it cannot constitute negligence, citing, Wommack v. Orr, 352 Mo. 113, 176 S.W.2d 477; Stein v. Buckingham Realty Co., Mo.App., 60 S.W.2d 712; and Pevesdorf v. Union Electric Light & Power Co., 333 Mo. 1155, 64 S.W.2d 939. Suffice to say as to the rule relied upon that in this case defendant's evidence does not necessarily establish that the construction of the temporary bridge did conform to standard practice but was subject to the opposite conclusion. This, for the reason that at least one of defendant's expert witnesses testified in effect that standard practice called for making the ends of the planks flush with adjacent surfaces wherever possible. Such was possible and practicable in this case. Thus the evidence was conflicting as to whether customary, standard construction was employed and we need not discuss the bearing of the rule relied upon in other situations. State ex rel. Elliott's Department Store Co. v. Haid, 330 Mo. 959, 967, 51 S.W.2d 1015, 1018[1]; and see: Olds v. St. Louis Nat. Baseball Club, Mo.App., 119 S.W.2d 1000, 1004[7, 8].
Defendant also says that plaintiff was or should have been fully aware of the construction of the temporary bridge, that its condition was obvious, and that defendant had no more knowledge concerning it than plaintiff had or should have had. The only evidence, however, by which plaintiff is bound, other evidence to the contrary notwithstanding, tending to show plaintiff's knowledge of the manner in which the temporary bridge was constructed is: that plaintiff walked over the bridge from east to west as he was proceeding to the place where the express wagon in question was parked; that plaintiff admitted signing a statement the day after the accident, in which he said in part, "Sometimes it is very hard to get a loaded depot truck up this small incline due to the excessive weight on the truck, and unless the wheels hit square, it would throw a man off balance"; and the *1003 inference that because this same type of temporary bridge had been used on prior occasions during the process of converting the wood platforms to concrete, plaintiff must have known, or is chargeable with knowledge of, the manner in which the bridge was constructed. But this evidence does not compel the conclusion that plaintiff knew or should have known the extent to which the board at the west end of the temporary bridge was beveled or that said board was not sufficiently beveled to make it reasonably safe to pull a heavily-loaded express wagon over it in such a manner that one of the front wheels would strike before the other.
Likewise, plaintiff's realization at the time he made the statement the day after the accident that the failure of the two wheels to hit the cross board simultaneously "would throw a man off balance" does not necessitate the conclusion that plaintiff had this knowledge at or prior to the time of the accident.
The cases cited by defendant, of which Vogt v. Wurmb, 318 Mo. 471, 300 S.W. 278; Ilgenfritz v. Missouri Power & Light Co., 340 Mo. 648, 101 S.W.2d 723, and Mullen v. Sensenbrenner, Mo.Sup., 260 S.W. 982, are illustrative, assert the general proposition that there is no liability on an owner or occupant for injuries from dangers that are obvious and as well known to the person injured as to the owner. The relationship between owner and business invitee in those and like cases necessarily involves different circumstances than the circumstances involved in the instant case wherein a landlord has supplied a temporary structure as a part of a platform for use of his tenant with knowledge that the temporary structure will and must be used for a particular purpose. See: Bartlett v. Taylor, 351 Mo. 1060, 1068[3], 174 S.W.2d 844, 849[6]; Cameron v. Small, Mo.Sup., 182 S.W.2d 565, 567[3, 4]. But by analogy the principle of defendant's cited cases is applicable. None of them, however, is authority for defendant's contention under the instant facts. We may not say as a matter of law that the manner in which the west end of the temporary bridge was constructed, in so far as concerned its intended use by plaintiff, was obvious to plaintiff and as well known to him as to defendant, nor may we say as a matter of law that plaintiff appreciated, or was bound to have appreciated, from the appearance of the bridge, the danger involved in its use. State ex rel. First Nat. Bank in St. Louis v. Hughes, 346 Mo. 938, 144 S.W.2d 84.
Defendant contends that plaintiff was guilty of contributory negligence as a matter of law. What we have said concerning knowledge and appreciation of the danger on plaintiff's part in connection with the contention that plaintiff failed to prove negligence is likewise applicable to this contention. It was for the jury to say whether plaintiff, in the exercise of ordinary, care, with his knowledge as to the temporary bridge, his ability to have observed it under the conditions as to light, and in the view of his right to rely to some extent upon the implied assurance that defendant would use ordinary care to make the temporary bridge reasonably safe for the particular use, would conclude that he could safely use the bridge in the manner in which he attempted to use it. Roman v. King, 289 Mo. 641, 654, 233 S.W. 161, 164[4, 5], 25 A.L.R. 1263. No warning was given calling attention of employees of Express Co. to the necessity of causing both wheels to strike the cross board simultaneously. The evidence does not compel a conclusion contrary to the direct statements of plaintiff (even though those statements were themselves conclusions) to the effect: that he did not know of the exact construction of the bridge; did not know that a use of it in the manner in which he used it would result in the jerking of the tongue of the wagon; that he had never before used the temporary bridge; and that he had had no prior experience which would indicate to him the danger involved in its use. Bartlett v. Taylor, supra, 174 S.W.2d 850, 851. We may not say as a matter of law that plaintiff had "such comprehension of the risk of injury involved" in using the temporary bridge that reasonable minds could only conclude that he fully appreciated the danger and proceeded to use the bridge in the manner in which he used it heedless of the consequences. Bartlett v. Taylor, supra, 174 S.W.2d 851; Roman *1004 v. King, supra, 233 S.W. 166[11]; Stupp v. Fred J. Swaine Mfg. Co., Mo.Sup., 229 S.W.2d 681, 686[6, 7].
But defendant says plaintiff must have known the result of pulling the express wagon so that one front wheel struck the incline before the other, because, defendant says, it is common knowledge (every one knows) that the inevitable result of so pulling a wagon would be a jerking of the tongue. We may assume that it is common knowledge that when any wagon (whether the instant express wagon or a child's play wagon), equipped with a fifth wheel, is so propelled that one front wheel strikes an object before the other, the tongue will tend to pull towards the deflected wheel. It does not follow, however, that such knowledge on the part of plaintiff convicted him of contributory negligence as a matter of law because he failed to cause the wheels to strike simultaneously. The trouble with defendant's contention is that it assumes that plaintiff knew or should have known that the beveled board at the end of the temporary bridge was not sufficiently beveled to make the approach gradual enough that the bridge could be safely used even though one front wheel struck before the other. Certainly an approach to a raised platform (temporary bridge) may be so gradual that to strike it with one wheel of a wagon prior to the other would not cause a jerk of sufficient violence to break the grip of the one pulling the wagon and throw him to one side. The violence of the jerk and whether it would be sufficient to cause injury to the one pulling the wagon would necessarily depend upon the size of the object struck or, in this instance, upon the degree of the slope (whether gradual or abrupt), upon the firmness of the grip of the one pulling the wagon, upon the size and weight of the wagon being pulled, and upon the speed at which the wagon was moving. Defendant in constructing and maintaining the bridge could not reasonably assume that express wagons would in every instance be so carefully propelled that the front wheels would strike the cross board at exactly the same instant.
Defendant contends that the court erred in giving instruction A "because it submitted a factual hypothesis which was not supported by the evidence." Our consideration of this instruction is confined to the specific error alleged. Instruction A was: "The Court instructs the jury that if you find and believe from the evidence that the plaintiff was in the employ of the Railway Express Agency, Inc. and that said company was a tenant of the defendant, and if you further find and believe from the evidence that the defendant furnished platforms on its premises for the plaintiff and others to use in moving trucks of express, if you so find, and if you further find and believe from the evidence that the defendant in changing the construction of said platforms and particularly the one in evidence caused a temporary bridge to be constructed on said platform so that blunt ends of boards were exposed and said blunt ends were not sufficiently beveled so as to allow trucks to be safely pulled over the same, if you so find, and if you further find and believe from the evidence that the condition of said bridge and the blunt ends of the boards as aforesaid was dangerous in that when trucks were pulled over the end of said bridge the tongue of the truck would be deflected and the person pulling on said tongue would be thereby thrown, if you so find, and if you further find and believe from the evidence that the defendant knew or by the exercise of ordinary care could have known of the said dangerous condition, if any, if you so find, and if you further find and believe from the evidence that on April 25th, 1948 the plaintiff was pulling a truck onto said bridge and that the tongue of said truck was deflected by reason of the condition of the platform as aforesaid and that when said tongue was deflected the plaintiff was twisted and thrown, if you so find, and if you further find and believe from the evidence that the defendant was guilty of negligence in causing said bridge to be so constructed and that negligence, if any, directly caused the accident and plaintiff's injuries, if any, then you are instructed that your verdict *1005 shall be in favor of the plaintiff and against the defendant." (Italics ours).
It is claimed that the instruction submits the question of whether the blunt ends of the boards were sufficiently beveled and does not submit the question of whether the board which was laid crosswise at the ends of the planks forming the temporary bridge was sufficiently beveled. Defendant says that all the evidence showed that a 2" x 6" beveled board (the evidence as to the extent of the beveling was in conflict) was placed across the blunt ends of the lengthwise boards forming the temporary bridge; that there was no evidence to support a submission that defendant was negligent in failing to sufficiently bevel the blunt ends of the lengthwise boards; and that the latter issue is the only issue submitted by the instruction. Defendant also says, "Since the jury might have found that the court thought that the blunt ends of the boards were exposed and not sufficiently beveled and that such caused plaintiff's injury (for otherwise the court would not have submitted that issue) the instruction is misleading and reversible error."
It is true, as defendant contends, that the instruction in its italicized parts above, hypothesizes that the temporary bridge was constructed "so that blunt ends of boards were exposed and said blunt ends were not sufficiently beveled * * * and * * * that the condition of said bridge and the blunt ends of the boards as aforesaid was dangerous * * *." Certainly these hypotheses are ineptly phrased and are technically inaccurate, and if by reason thereof the jury was misled or confused or permitted to find liability for alleged negligence on a factual hypothesis not supported by the evidence, then this verdict-directing instruction was reversibly erroneous. But, as defendant points out and as an examination of the record discloses, there was no dispute about the fact, and all the evidence on the subject was to the effect, that a 2" x 6" board, beveled to some extent, was placed at and remained across the ends of the lengthwise planks forming the temporary bridge. Conversely, there was no word or suggestion in the opening statements, in the evidence, or in the portion of the argument preserved in the transcript, indicating that it was charged or contended that the end of each lengthwise board should have been beveled. The sole issue was whether the board which had been laid crosswise at the ends of the lengthwise boards was sufficiently beveled. The ultimate question as to sufficiency of the beveling necessarily resolved itself into whether the west end of the temporary bridge was so constructed as to make the approach to its surface a sufficiently gradual one. So that, in final analysis, the question the jury had to decide was whether the approach was gradual enough or too abrupt and thereby unsafe. The language of the instruction negatives the idea that the jury would believe that the issue was whether the end of each board of the temporary bridge should have been beveled rather than whether the cross board had been sufficiently beveled. This, because the instruction used this language: "and said blunt ends were not sufficiently beveled". Inasmuch as sufficiency of beveling (whether the approach was sufficiently gradual or too abrupt) at the west end of the temporary bridge was submitted, it was of no particular consequence in the jury's ultimate conclusion that the instruction referred to "blunt ends" rather than to the cross board placed at the ends of the lengthwise boards. Difficult as it is to comprehend why this instruction was so drawn, we cannot believe the jury was misled or confused either as to the exact construction of the temporary bridge or as to the fact that the sufficient beveling referred to in the instruction pertained to the beveled condition of the cross board and not to the question of whether the individual blunt ends of the lengthwise boards were exposed in an unbeveled condition. We are convinced that the inaccurate wording of the instruction under the record in this case was not error materially affecting the merits of the action. Section 512.160 RSMo 1949, V.A.M.S.
Defendant contends that the judgment for $10,000 is grossly excessive. Plaintiff was 43 years of age at the time of trial. He was thrown to one side in a "twisting" motion and immediately experienced pain *1006 in his back. He remained on the job in a supervisory capacity until the end of his shift. The pain in his upper back continued and he developed a severe headache. He returned to work the next day and the following day was sent to a doctor. Plaintiff complained of back pains and headaches. The doctor found nothing wrong with his back upon superficial examination, gave him heat treatments for three days, and instructed him to continue the heat treatments at home. During the period of about 60 days, plaintiff continued to work as lead man except for occasional days when he couldn't stand the pain, but performed no heavy labor. He continued to suffer pain in his back, severe headaches continued, and pain in his arms developed. He did not have the same control of his hands as formerly in that he could not "hold onto things." After about 60 days he was referred to another doctor who hospitalized plaintiff for 16 days. Traction was applied to his head and neck for an hour on each of the 16 days. Thereafter, he wore a felt collar for 60 days to support his head. Ninety days subsequent to entering the hospital he was discharged and returned to work as an express handler. He does the best he can; has trouble holding onto packages; his head constantly aches; has pain in his back and arms; his right arm becomes numb and tingles when he lies on his right side; he can notice no improvement in his condition. He had had no prior trouble with his head, back, or arms, and formerly did work around his house, consisting of plumbing, roofing, painting and paper hanging, which he is now unable to do because of pain. Since returning to work he has lost a few days because of pain. He has had no medical treatment since being discharged. There was no evidence of loss of earnings or of medical or hospital expense.
Neither of the doctors who treated plaintiff testified. A doctor testified that he examined plaintiff in September 1948 and again a few days before trial; that plaintiff's complaints on first examination were of headaches and of a backache in the upper midportion of his back. The doctor's findings were: tenderness on percussion over the spinous processes to the left of the fifth and sixth dorsal vertebrae; pain on moving neck from side to side, causing pain in the shoulder girdle. On examination just prior to trial, plaintiff's complaints were, in addition to headaches and back pains, a feeling of stiffness in the shoulder and neck, dropping things at work, inability to sleep on the right side, and of tingling in his right arm and hand when in a position which caused his back to flex to the left. The back pain was localized in an area between the second and fifth dorsal vertebrae; this pain was aggravated by any movement of the head, neck, shoulder girdle, or arms. There was no muscle spasm. X rays disclosed a mild scoliosis to the right, and hypertrophic arthritic changes, in the thoracic spine; and the absence of the normal curve in the cervical spine. The doctor testified that there "may be" a connection between plaintiff's complaints and the condition (lack of normal curve) in the cervical spine; that the arthritic condition of the thoracic spine pre-existed the injury, and that the accident aggravated the pre-existing arthritic condition; that the pain resulting from the aggravation of the arthritic condition will continue with no improvement likely; that the condition of loss of normal curvature in the cervical spine, plaintiff's complaints, and the doctor's physical findings "lead us to believe that there is a possibility that he may have some damage to the nerves in the cervical spine, possibly a disk, a herniated disk"; that plaintiff's symptoms did not prove a disc but were simply indications that such a thing should be considered; that plaintiff's condition could result from the type of injury plaintiff sustained. The doctor further testified that the cervical condition encountered was not unusual in that it is encountered with fair frequency, but that it is significant; that this loss of curvature of the cervical vertebrae is not necessarily associated with arthritis.
Plaintiff's medical evidence as to injuries sustained, viewed most favorably from the standpoint of plaintiff, established that a pre-existing arthritic condition was aggravated, the pain from which will be permanent. The testimony as to the causal connection between the accident and the *1007 loss of normal curvature in the cervical spine does not go beyond an expert opinion that there might or could be a connection. It is evidence only of scientific possibility which is proper for the jury to consider, and helpful where there is other evidence which tends to show that an accident caused a certain condition. Kimmie v. Terminal R. Ass'n of St. Louis, 334 Mo. 596, 605, 66 S.W.2d 561, 565[9-11]. But in view of plaintiff's medical evidence that the loss of curvature in the cervical spine is encountered frequently and the medical opinion establishing only scientific possibility of causation, we are of the view that there was no substantial evidence from which the jury could reasonably find that the condition of the cervical spine resulted from the accident. Likewise, there was no substantial evidence from which the jury could reasonably find that plaintiff had suffered a herniated disc; the doctor's testimony on the subject amounted to no more than a suggestion of a possibility.
Summarizing: plaintiff was hospitalized for 16 days; he was away from work 90 days; he had no loss of wages, hospital or medical expense; he worked for about 60 days immediately following the injury and has been working continuously (except for occasional days missed due to pain) since the expiration of the 90-day period at a job requiring more physical exertion than did his job at the time of injury; no impairment of earning capacity was shown; he suffers pain in his back, neck, shoulder, and arms; he has headaches; he has trouble in holding onto packages; he will continue to have pain from an aggravation of a pre-existing arthritic condition.
In support of the verdict and judgment, plaintiff cites Osburn v. Kansas City Southern Ry. Co., 360 Mo. 813, 230 S.W.2d 856; Hayes v. Wabash R. Co., 360 Mo. 1223, 233 S.W.2d 12; Lange v. St. Louis Public Service Co., 361 Mo. 74, 233 S.W.2d 641; and Abernathy v. St. Louis-San Francisco Ry. Co., Mo.Sup., 237 S.W.2d 161. None of these are helpful in that each of them involves injuries so different from, and so much more serious than, those in the instant case that they are not fairly comparable. Both plaintiff and defendant rely upon
Howerton v. Railway Express Agency, 361 Mo. 564, 235 S.W.2d 250, in which a verdict of $14,000, reduced by the trial court to $10,000, was approved. While our holding there was only that the verdict as reduced was not excessive, the case does not support plaintiff's contention that a verdict and judgment of $10,000 in the instant case is not excessive. There a baggage hauler, 44 years of age, received fractures of the spinous processes on the right of the 1st and 2nd lumbar vertebrae and an aggravation of an arthritic condition in the lumbar spine. There was testimony that he would have some permanent deformity of the fractured vertebrae and a sensitive back all his life, and that exercise or work would produce pain. His ability to perform heavy manual labor was impaired. He had not worked at the time of trial for almost ten months and had sustained a loss of earnings at the time of trial of approximately $2,900.
Plaintiff's injuries in the instant case are more nearly comparable to the injuries (as to severity), resulting disability, and loss, in Harvey v. Gardner, 359 Mo. 730, 741[10], 223 S.W.2d 428, 433[11], and Hamilton v. Patton Creamery Co., 359 Mo. 526, 537, 222 S.W.2d 713, 718. In the Gardner case we reduced an $8,000 judgment to $5,000, and in the Hamilton case we reduced a $10,000 judgment to $6,998.
Having regard for a fair uniformity of judgments, taking into consideration the fact that the trial court has approved this judgment for $10,000, taking into account economic conditions, and the factors which have to do with our right to interfere with a jury's verdict, and having in mind that plaintiff, except for 90 days, has been and was at the time of trial employed as an express handler and has sustained no loss of wages or medical or hospital expense, we are of the opinion that the maximum amount for which a judgment should stand is the sum of $7,500.
If, within fifteen days after the filing of this opinion, plaintiff will enter here a remittitur of $2,500, the judgment will stand affirmed in the sum of $7,500 as of the date of the original judgment. Otherwise, the *1008 judgment will be reversed and the case remanded for a new trial.
VAN OSDOL and LOZIER, CC., concur.
PER CURIAM.
The foregoing opinion by COIL, C., is adopted as the opinion of the court.
All concur.