**Vernie BURNS, Respondent,**

v.

**KANSAS CITY PUBLIC SERVICE COMPANY, a Corporation, Appellant.**

No. 43783.

Supreme Court of Missouri.
Division No. 1.

Dec. 13, 1954.

Charles L. Carr, E. E. Thompson, Sam Mandell, Kansas City (Popham, Thompson, Popham, Mandell, Trusty & Green, Kansas City, of counsel), for appellant.

Lyman Field, Rogers, Field & Gentry, Kansas City, for respondent.

LOZIER, Commissioner.

In his action for personal injuries, plaintiff-respondent (herein called plaintiff) had verdict and judgment against defendant-appellant (herein called defendant) for $12,500. Defendant appealed.

Defendant here challenges the propriety of an instruction and contends that the verdict was excessive because not supported by substantial evidence.

On April 19, 1948, plaintiff was a passenger on defendant's Jackson Street streetcar when it was struck from the rear by defendant's Vine Street streetcar. Three rear vestibule windows and one transom window and two rear center posts of the Jackson Street car were broken and its roof was damaged. The front dash and controller of the Vine Street car were "pushed back" and its air pipes, two front center posts and two windows were broken. According to one of defendant's witnesses (a passenger on the Jackson Street car), the impact was "a terrific smash." Plaintiff, standing with his back against a guard rail in the extreme rear of the car, was thrown forward into the aisle and was injured.

The case was submitted under the res ipsa loquitur theory. Plaintiff's Instruction 1 was: "The court instructs the jury it is admitted as a fact in this case that at the time of the occurrence in question, the plaintiff Burns was a passenger on defendant's streetcar No. 1158, and while so upon said streetcar as a passenger, when the car was at or near the intersection of 19th and The Paseo in Kansas City, Missouri, an eastbound Vine Street car owned and operated by the defendant, ran into and collided with the

rear of the streetcar in which plaintiff was riding.

"Therefore, you are instructed that if you shall find and believe from the evidence that plaintiff Burns received injuries at said time and place, and that such injuries, if any, directly resulted from the collision of the two streetcars, *then you are instructed that such facts, if you believe them to be true, are sufficient circumstantial evidence to warrant a finding by you that the defendant was negligent, and you may so find, unless you find and believe from the other facts and circumstances in evidence that the occurrence was not due to defendant's negligence, and if you do find and believe from all the evidence in the case that the defendant was negligent, and that plaintiff's injuries, if any, were directly caused by the defendant's negligence, then your verdict should be for the plaintiff.*" (Our italics.)

Conceding that the instruction "follows the pattern suggested by this court in Harke v. Haase, 335 Mo. 1104, 75 S.W. 2d 1001, 1004, the defendant respectfully suggests that the instruction was prejudicially erroneous. * * * After directing the jury that negligence may be inferred, the instruction continues, 'unless you find and believe from the other facts and circumstances in evidence that the occurrence was not due to defendant's negligence, etc.' And so the jury was instructed that they can *only* return a verdict for defendant of no negligence based upon 'other facts and circumstances' not including evidence of plaintiff having been a passenger, that a collision occurred and that the plaintiff was injured. * * * The instruction therefore improperly shifts the burden of proof onto the defendant as well as the burden of evidence, contrary to the prohibitions of McCloskey v. Koplar, 329 Mo. 527, 46 S.W.2d 557 [92 A.L.R. 641]" and, in effect, directs a plaintiff's verdict. Defendant also argues that the instruction "requires the jury to consider and pass upon the evidence piecemeal to the exclusion of other evidence and not as an entirety."

However, the above italicized portions of Instruction 1 are, verbatim, those suggested by this court in Harke v. Haase, supra, 75 S.W.2d 1001, 1004[9], and used in Missouri res ipsa cases by plaintiffs' lawyers for twenty years. Too, verdict-directing Instructions 5 and 6, given at defendant's request, made very clear to the jury that defendant was not an insurer, was liable only if shown to have been negligent, should not be found negligent from the mere fact of the occurrence shown by plaintiff's evidence, the burden of proof was upon plaintiff "to prove his case by the greater weight of all the credible evidence in the case" and was not entitled to recover unless he had "discharged his burden of proof so resting upon him." (Instruction 6 was almost verbatim that suggested in the Harke case for use by a defendant in stating a plaintiff's burden of proof in a res ipsa case.) Compare Venditti v. St. Louis Public Service Co., 362 Mo. 339, 240 S.W.2d 921, 926[7]. The assignment is overruled.

Plaintiff was 36 years old at trial time, 32 at the time of the accident. He testified that before the accident he had had no trouble, pain or disability in his back area although he had felt numbness on the right side of his back in the region of his right kidney. He was in the army between March 1941 and February 1944 and received a medical discharge because of "a non-functioning right kidney." He had not previously "known anything about it." While in service he had frequent urination and numbness in the right side of his back "in his kidney region * * * but no other noticeable disability or pains in his back. And he had had no trouble whatsoever in performing the heavy work incident to his military duties."

After his discharge in February 1944, plaintiff worked first for Commonwealth Aircraft ("hooking cables onto gliders to be put on freight cars"), then for Pratt-Whitney ("machine operator, various ma-

chines"). In April 1946 he went to Perry, Iowa, and worked in a "garage and did odd jobs, mowing lawns and I tried working on other jobs." He returned to Kansas City in September 1947 (for the purpose of studying tailoring under the "G. I. Bill of Rights," 38 U.S.C.A., Secs. 693 et seq., esp. 916–984) and entered Twin Cities Tailoring School in December 1947. On March 1, 1948, he transferred to Heart of America Tailoring School and was a student in that school on the day of the accident, April 19, 1948. On August 18, 1948, he "voluntarily withdrew" from that school. He then enrolled in Weaver Real Estate School. He completed the real estate training course on March 4, 1949. In February 1949, after qualifying under a civil service examination, he began working at the Army Records Center (where he was still employed at trial time) and took further training in Lincoln Business School. He "voluntarily withdrew" from that course January 1, 1952.

Plaintiff testified that he was "unemployed" in 1948 after the accident until he enrolled in the real estate school (August 27, 1948) and received some help from the Red Cross and Salvation Army, organizations which "investigated and found him unable to work."

According to the V. A. records (plaintiff's evidence), since his discharge plaintiff has drawn, and is still drawing, a monthly pension of $47.25 for his rated 30% disability resulting from his atrophied right kidney. Also: Between December 8, 1947, and January 1, 1952, except for periods of absence from training or employment, the V. A. paid plaintiff a monthly education-training-subsistence allowance of $120, and, after his earnings started February 16, 1949, less a proportion of his earnings. The records showed: He was paid $117.52 for December 1948 (he was off two days that month); he was paid $93.48 for the months in 1949 he earned $196.12 a month; he was not paid for three days absence in April 1950 but was paid $78.30 for the rest of April as his earnings for that month were $211.68; in 1950, he was absent between May 6 and June 26, the first week in August and 5 days in November; between August 9 and October 6, 1950, his monthly earnings were $219.17, and he was paid $70.37 monthly; he was paid $60 a month between November 1950 and December 1, 1951; he was absent the first week in December 1951 but earned $259.96 the last 3 weeks of that month and was paid $30.03 for that month and for the following month, January 1952. He drew no education-training-subsistence pay after January 31, 1952.

At the time of the accident plaintiff was, and since sometime in 1947 had been, working days in a drugstore as a fountain and delivery boy and porter "at $25 a week plus tips which almost double my salary." He went to school nights. In August 1948 he resumed this drugstore work for 2 or 3 days but quit because he "would have pains in lifting ice cream cartons and pop cases." He said that he had to quit his tailoring course because of pain caused by the positions he had to assume to do that kind of work. Plaintiff's work at the Records Center is office and clerical and involves no lifting or heavy manual labor.

The medical evidence favorable to plaintiff was that his left kidney and his back were injured in the accident. Plaintiff testified that when he stepped off the streetcar he had a sharp pain in his back and that a few minutes later he noticed flecks of blood in his urine. That night he told defendant's representative that he had back pains and had passed blood in his urine both that morning and that evening. The next morning he complained to Dr. L. V. Miller of back pains and told of having passed blood the preceding day. Dr. Miller taped the lower part of plaintiff's back and treated him for superficial injuries (long since healed and not instantly involved).

Plaintiff was in Wheatley-Providence Hospital April 19–28, 1948, as Dr. Miller's patient. The records of the hospital showed the initial diagnosis as "injury to back, head and kidneys" and plaintiff's complaints as "pains in the back. Patient

states that about 2 days ago he was involved in a streetcar accident causing injury to the back, manifested pain and tenderness of the lumbar region, associated with headaches and dizziness. * * * Following accident, he noticed little blood in urine plus burning and frequency of urination." Among the "physical findings" was "tenderness to palpitation of the lumbar-sacral region and of the left vertebral angle." The diagnosis was "injury to back, head and kidney." The pyelogram showed the left kidney shadow as "normal" and no shadow in the right. The spine X-rays showed a "nonfusion of the lamina of L5 and S1," diagnosed as "pre-spondylolisthesis."

Dr. Miller (defendant's witness) testified that, while plaintiff was in Wheatley-Providence Hospital, he complained that "his back was hurting him and that he had headaches, dizzy spells. He said also that he had some blood in his urine and a burning sensation when he voided his urine." Dr. Miller's final findings were "hydronephrosis of the right kidney and contusion of the left kidney." Dr. Miller conceded that his 1948 finding that plaintiff had sustained "a sacroiliac sprain of the spinal column and a severe nervous shock" was "based upon something (then) present" in plaintiff.

Dr. Jacob Zellermayer, urologist, first examined plaintiff on July 16, 1948. He found tenderness in the left lumbar region, over the left kidney and blood in the urine. He sent plaintiff to General Hospital on August 8, 1948, and an analysis of urine from the left kidney showed blood. Between July 16, 1948, and November 24, 1952, Dr. Zellermayer saw plaintiff at his office on 58 occasions, upon 8 of which the doctor examined plaintiff "by special cystoscopic procedures." There was less blood in plaintiff's urine on August 30, 1948, and some in February 1950, the last time Dr. Zellermayer found blood in plaintiff's urine.

An intravenous pyelogram made in July 1948 showed the left ureter "deviated over to the side" instead of being straight, a condition frequently resulting from kidney

injuries. X-rays taken in May 1950 showed the left ureter "deviating, less so, but to a slight degree to the midline. Of course, two years have elapsed since the previous films (July 24, 1948) when the ureter deviated more. * * * There is still some deviation present."

It was Dr. Zellermayer's opinion in July 1948 that plaintiff had sustained in the April 19, 1948, accident "a contusion and a cortical laceration of the left kidney, * * an injury in the way of a bruise and a tear in the cortex, but not going all the way through to the pelvis (of the kidney). * * * It could also be that the urine from this bruised area collected here contained blood and that this blood showed in the urine, but the appearance of blood is evidence in this case of either a small tear from the region of the injury into the pelvis or a contusion with the blood coming into the collecting system through these ducts or possibly both. But the appearance of blood in this collecting system with that history indicates that this injury, this kidney had incurred an injury sufficiently great so that bleeding was evidenced in the urine." In the doctor's opinion, the blood in plaintiff's urine immediately after the accident was the result of trauma sustained in the accident. Dr. C. G. Leitch (defendant's witness), who examined plaintiff on December 16, 1952, said that the blow plaintiff received in the accident could have caused damage to the kidney, "it would be unreasonable to say that it wouldn't."

Dr. Zellermayer testified that the normal range of clearance of NPNs (non-protein nitrogens) in the blood cleared by the kidneys was 25–30, "at the outside 35," milligrams per 100 cubic centimeters of blood; that the July 1948 test showed 37. He said that the V. A. records, which he had examined, showed that before the accident plaintiff's NPN test was highest in 1945, "31, well within normal limits," and that after the accident was "38, beyond the normal limits, 35 is the absolute top limit. * * * This indicates a serious condition in the kidney, a considerable amount of kidney damage, of the filtering system, indicates

that a certain number of these filter units had been knocked out probably due to the scar tissue formation due to these injuries and he no longer has enough filters to really filter the entire blood completely, so there is definite damage to that kidney and to his total kidney functions, as all he has left is just that one kidney for all practical purposes."

In Dr. Zellermayer's opinion, the damage to plaintiff's left kidney is "definitely permanent. This increased rating on this NPN test after the accident and this consistently high reading on this test definitely had an effect on his life span. Under any kind of strain or unusually long living without any restriction on his activities, that kidney cannot carry on its normal functions under all conditions. * * * It depends a good deal upon the amount of activity this man would have to do. * * * Assuming normal activity, I would say his life expectancy would be reduced anywhere from 5 to 10 years, probably more. Of course, with restricted activity that would be improved but with normal activity and the usual stresses that he might be subjected to, possibly heavy physical labor, I would say 5 to 10 years is conservative."

At trial time, Dr. Zellermayer had not released plaintiff, "he can't ever be released in view of his condition, he should be checked periodically at all times. * * * He has poor overall kidney function and any undue strain on the kidneys is liable to be too much of a load for him. His kidneys may at any time be unable to function normally under, say, conditions of stress or other unusual conditions, and which will result in additional damage and finally could, of course, result in uremia, in case where the kidneys are damaged to the point where they cannot carry on satisfactorily under stress and under all conditions."

Dr. Robert H. Fitzgerald, orthopedic surgeon, examined plaintiff on November 26, 1952. Plaintiff complained of pains in his "low back." X-rays showed a congenital defect in the 5th lumbar vertebra and fragmentation and a slipping forward of that vertebra on the sacrum, "a first degree spondylolisthesis." Dr. Fitzgerald, agreeing with Dr. Miller, said that the spine X-rays taken at Wheatley-Providence Hospital on April 26, 1948, showed "no definite anterior slipping" of the 5th lumbar vertebra. However, in Dr. Fitzgerald's opinion, the fragmentation and slipping could have been caused by the blow to plaintiff's back in the accident, injuring the soft supporting tissues "so that there will be a gradual slipping. * * * It could be either at the time of the accident or as a result. I would be inclined to feel it is the result of the accident, that is, it occurred sometime afterwards," although he could not say just when the slipping occurred. This condition frequently results from trauma. Dr. Leitch agreed that the blow could have caused the fragmentation and slipping. In Dr. Fitzgerald's opinion, this slipping produced a permanent partial disability of 20–25 per cent of plaintiff's body as a whole; plaintiff was qualified and able to do his clerical and office work at the Records Center, although "he may have some discomfort, pain in doing this kind of work." Dr. Fitzgerald found that plaintiff had "positional pain," i. e., pain resulting from remaining in one position for any length of time. Plaintiff's back pain and discomfort is intermittent; lifting, bending and stooping aggravates it. Dr. Fitzgerald would recommend a bone grafting-and-fusing operation only if plaintiff "persists in pain, definitely he can accept his pain or take the operation and get rid of it." Plaintiff would have to wear casts for 12 weeks and thereafter a support for an indefinite time. The surgeon's fee for such an operation would be "somewhere around $500" and the 6–7 weeks' hospitalization costs would be $7 or $8 a day.

The V. A. records showed that urinalyses, made on 5 different occasions between February 1942 and December 1943, while plaintiff was in service, showed blood in his urine. Also: In September 1945, in an examination at the V. A. Excelsior Springs hospital, plaintiff complained of "dull pain in right flank. He has urgency and frequency of urination. * * * He states he urinates every hour and feels as if he had to void after he finishes urinating

* * *. There is no history of hematuria" (blood in the urine). The right kidney was diagnosed as atrophied; there was no diagnosis as to the left. Also: In November 1948, plaintiff, in the V. A. Wadsworth hospital in connection with his request for an increase in his pension, did not mention the instant accident but stated that "about six months ago he passed some flecks of blood in his urine. * * * Patient states that his blood has cleared up and all his other GU symptoms have cleared up and at the present time he is asymptomatic. However, he does complain of some low back pain in the lumbrosacral region and states that he has not been able to do any heavy type of work or lifting because of his back."

Plaintiff testified that he still had headaches, dizziness and "pains in my back, lower part of my back." He is still under Dr. Zellermayer's care for his kidney and upon the prescribed liquid diet requiring him to drink as much water as possible during the day. "When I drink a lot of water at night, I try not to but if I happen to, do drink a lot, I get up three or four times a night. I couldn't drink any this morning because I couldn't stay in the courtroom, I would have to be going in and out all the time." He said that after the accident he could not do any lifting or heavy work or student-tailor work that did not cause pain.

■ Was the verdict excessive? The trial court, who weighed the evidence as to this matter in ruling defendant's new trial motion, did not think so. Defendant contends that the verdict is excessive because "there was no substantial or probative evidence of any serious injuries to plaintiff's left kidney or spine or any serious disability resulting from the accident." However, our factual summary of the evidence, viewed in the light most favorable to *plaintiff*, shows that there was substantial evidence from which the jury could reasonably find that both plaintiff's kidney and spine injuries were serious and permanent.

Dr. Zellermayer's bill to trial time was $600 and plaintiff will have to pay for consultation regarding, and examination and treatment of, his left kidney for the rest of his life. Dr. Fitzgerald did not testify as to the amount of his bill. There was no evidence that plaintiff incurred hospital expense. Plaintiff may or may not have to expend approximately $1000 for surgical, medical and hospital expenses in connection with a spine operation "if he can't stand the pain" in his "low back."

■ As defendant points out, plaintiff continued to receive his G. I. student-subsistence pay until January 31, 1952. He began work at the Records Center in February 1949 at an annual salary of $2,280, and at trial time was on a permanent civil service status and was drawing about $3,300 annually. Apparently plaintiff, after he started working at the Records Center, was working at the drugstore nights, Saturdays, Sundays and holidays (not during the daytime as he had when he was a student). He testified that he had been working at the drugstore job "since he began working" at the Records Center in February 1949, on another occasion, "some of the time," and on another occasion, "during 1952." In any event, he did not state when he worked there or what his wages were when he did work there, after the accident. We agree with defendant that any allowance for loss of past earnings or impairment of future earning capacity would be based upon pure speculation. See Williams v. Illinois Central R. Co., 360 Mo. 501, 229 S.W.2d 1, 6[7,8], 20 A.L.R.2d 322.

■ In support of its contention that the verdict was excessive, defendant cites: Harvey v. Gardner, 359 Mo. 730, 223 S.W. 2d 428; Baker v. Kansas City Terminal Ry. Co., Mo., 250 S.W.2d 999; Russell v. St. Louis Public Service Co., Mo., 251 S.W. 2d 595; Warner v. Terminal R. Assn. of St. Louis, 363 Mo. 1082, 257 S.W.2d 75, and cases cited in the footnotes in Howerton v. Railway Express Agency, Mo., 235 S.W.2d 250, 253. Plaintiff cites: Rinderknecht v. Thompson, 359 Mo. 21, 220 S.W.2d 69, Curry v. Thompson, Mo., 247 S.W.2d 792, 31 A.L.R.2d 1225, and Van Campen v. St.

Louis-San Francisco Ry. Co., 358 Mo. 655, 216 S.W.2d 443.

We have considered these and other cases. Again noting that the trial court did not believe that the $12,500 verdict was excessive, and taking into account the nature, extent and permanency of plaintiff's injuries and disabilities, his past and future pain and suffering, his age, his future medical expenses, the purchasing power of the dollar and the rule of uniformity of awards, we may not say that the verdict was excessive.

The judgment is affirmed.

VAN OSDOL and COIL, CC., concur.

PER CURIAM.

The foregoing opinion by LOZIER, C., is adopted as the opinion of the court.

All concur.